**Matthew GLASS and Lamphuen Chantala, Appellants–Plaintiffs,**

v.

**TRUMP INDIANA, INC., Appellee–Defendant.**

No. 45A03–0302–CV–70.

Court of Appeals of Indiana.

Jan. 28, 2004.

---

Darnail Lyles, Gary, IN, for Appellants.

Thomas W. Farlow, Julia Blackwell Gelinas, Kevin B. McCoy, Locke Reynolds, LLP, Indianapolis, IN, for Appellee.

**OPINION**

FRIEDLANDER, Judge.

Matthew Glass and Lamphuen Chantala (collectively referred to as Appellants) appeal a jury verdict in favor of Trump Indiana, Inc., (Trump) in the Appellants' consolidated civil lawsuit against Trump alleging malicious prosecution. Appellants present the following restated issue for review: Did the trial court err in instructing the jury on the doctrine of intervening cause?

We affirm.

The underlying facts are that Glass worked as a dealer on a gambling boat (hereinafter referred to as the Casino) owned by Trump. Chantala was a regular customer at the Casino. Robert Jones was the Executive Director of Casino Operations for Trump. On January 7, 1998, Jones noticed that Chantala was betting with chips in what was, for him, an unusually high amount. Chantala was playing the card game Mini Baccarat, and Glass was the dealer at his table. Jones contacted the Casino's surveillance department and asked it to monitor the game via remote surveillance cameras. Jones was informed that the surveillance department had already been monitoring the game. Jones went to the surveillance room and viewed several videotapes that had been recorded of the game Chantala was playing. Jones concluded that Glass was dealing the cards in an irregular fashion such that Chantala had an opportunity to view the faces of some of the cards as they were dealt.

At the time of the events in question, Mike Janiczak was an Indiana State Police officer who also worked as a gaming agent under the auspices of the Indiana Gaming Commission (the Gaming Commission) at the Casino. The Gaming Commission is the regulatory body that oversees gambling in the State of Indiana. Jones reported Glass's suspicious behavior to Janiczak, who initiated an investigation into the matter. In the course of that investigation, Janiczak spoke with Tim Jackomis, who was the manager of the Casino's surveillance department. The results of that interview and investigation were summarized in a probable cause affidavit later submitted by Janiczak. The contents of that affidavit, which we set forth here, were consistent with Janiczak's subsequent trial testimony.

> I further spoke with Tim Jackomis, whom I believed to be truthful and credible because he spoke of facts within his own personal knowledge, who conducted

a close surveillance of a Baccarat table where the dealer was Matthew Glass. After being advised of the suspected cheating scheme, he told me that the surveillance took place on January 7, 1998, and he had noticed a player who was subsequently identified as Lampheun Chantala in seat No. 1 and that Chantala had been playing there for three days and would only play when Matthew Glass was dealing. He further stated that at approximately 6:35 P.M. on January 7, 1998, he observed Matthew Glass expose a card to Mr. Chantala and observed him do this again at 6:51 P.M., and he observed Chantala lower his head to get a view of the exposed card. I subsequently viewed a video tape [sic] of this surveillance, together with Bob Jones and the tape shows that the shoe [1] is angled slightly facing seat No. 1, where Chantala is seated, and Matthew Glass has his left hand resting on the front part of the shoe, where the cards come out and that before the first card was removed. [sic] he slowly eased a group of cards back in the shoe to loosen the first card and that after relieving the pressure on the first card he eased the card upward to expose a small portion of the card's identify [sic], at the same time raising his hand up slightly to expose the card to the Seat No. 1 position. Bob Jones informed me that between the time the dealer exposed the card to the player, and the time he begins to deal the cards, there is enough time for the player to make a large wager to his advantage....

The surveillance tape further showed that while Mr. Glass was on break, Chantala would also take a break and would resume playing when Glass returned. Another surveillance tape revealed that when Glass left the casino after work, he was greeted by Chantala and a female companion outside the boarding entrance and conversation took place.

*Appellants' Appendix* at 20–21 (footnote supplied).

Janiczak presented the results of his investigation to the Lake County Prosecutor's Office. On January 22, 1998, the State filed criminal informations against Glass alleging two offenses. Count I charged Glass with aiding another in acquiring knowledge not available to all players in river boat gambling games, while Count II charged Glass with theft. Chantala was also charged in a two-count criminal information. Count I alleged that Chantal had committed betting with knowledge not available to all players in a gambling game. Count II alleged that Chantala had committed theft. Glass's case was tried before the bench in May 1999, and resulted in judgments of not guilty. On October 10, 2000, the State dismissed the case against Chantala.

■ On October 4, 1999, Glass filed a complaint for damages against Trump. Glass sought monetary damages from Trump on the theories of malicious prosecution, misuse of process, defamation, and intentional infliction of emotional distress. In December 2000, Chantala filed a complaint for damages against Trump, as well as a motion to consolidate his action with Glass's. Chantala's complaint alleged malicious prosecution, abuse of process, libel, slander, and intentional infliction of emotional distress. On December 6, 2000, the court granted a motion to consolidate Chantala's and Glass's civil actions against Trump. On May 9, 2002, Trump filed a motion for summary judgment. Trump claimed that it was entitled to summary judgment on the malicious prosecution al-

---

**1.** A "shoe" in this context is a card-dealing device that holds several decks of cards.

legation because, in essence, Trump did not institute a judicial proceeding against Appellants—the State did. Trump argued that it was entitled to summary judgment on the claim for abuse of process because it used legal process to accomplish an outcome that the process was designed to accomplish, thereby negating the second element of an abuse-of-process claim.[2] *See Reichhart v. City of New Haven,* 674 N.E.2d 27 (Ind.Ct.App.1996), *trans. denied.* Trump claimed that the statements made by Trump employees to Gaming Commission and State Police investigators were privileged communications and could not give rise to a defamation claim. Finally, Trump claimed that, as a matter of law, Appellants could not prove their claim of intentional infliction of emotional distress because Trump's actions "simpl[y] do not rise to the level of egregiousness required in order to assert a claim for" intentional infliction of emotional distress. *Appellee's Appendix* at 106.

On August 12, 2002, the trial court denied Trump's motion for summary judgment on the malicious prosecution claim with respect to both appellants. The court granted Trump's motion for summary judgment on all other counts with respect to both Glass and Chantala. Therefore, the matter proceeded to trial as to both appellants solely on the theory of malicious prosecution. Following a trial, the jury found in favor of Trump.

 Appellants contend that the trial court abused its discretion when it instructed the jury on the doctrine of intervening cause. The manner of instructing the jury is committed to the trial court's sound discretion. *Armstrong v. Federated Mut. Ins. Co.,* 785 N.E.2d 284 (Ind.Ct.App. 2003), *trans. denied.* Such rulings will be

reversed only upon a showing of abuse of discretion. *Id.* "An instruction's main purpose is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Id.* at 287 (quoting *Centennial Mortgage, Inc. v. Blumenfeld,* 745 N.E.2d 268, 278 (Ind.Ct.App.2001)). Moreover, not every error in instructing a jury warrants reversal. *Armstrong v. Federated Mut. Ins. Co.,* 785 N.E.2d 284. Such an error is harmless if we determine that a correct instruction would not have changed the verdict. *Id.* That is, instructional errors that do not prejudice substantial rights do not inevitably require reversal. *Lutheran Hosp. of Indiana, Inc. v. Blaser,* 634 N.E.2d 864 (Ind.Ct.App.1994).

The instruction of which Appellants complain provided as follows:

An intervening cause is an action by a third-party or [sic] that breaks the causal connection between the Defendant's alleged wrongful act and the Plaintiffs' injury. The intervening cause then becomes the direct cause of the injury.

If you decide that the injury to Plaintiff Glass would not have occurred without the action of a third party or agency, then Plaintiffs Glass and Chantala cannot recover from the Defendant.

If you decide that the injury to Plaintiff Chantala would not have occurred without the action of a third party or agency, then Plaintiff Chantala and Glass cannot recover from the Defendant.

*Transcript* at 734–35.

 We note that a party claiming error in the giving of an instruction is limited to the objection stated at trial. *Weller v.*

**2.** An abuse-of-process claim consists of two elements: 1) an ulterior purpose, and 2) a willful act in the use of process not proper in

the regular conduct of the proceeding. *See Reichhart v. City of New Haven,* 674 N.E.2d 27 (Ind.Ct.App.1996), *trans. denied.*

*Mack Trucks, Inc.,* 570 N.E.2d 1341 (Ind. Ct.App.1991). At trial, Appellants' counsel interposed the following objection to the instruction:

> I object to the Court's Final Instruction Number 19 instruction that is related to the law relating to intervening cause.
>
> Intervening cause is inapplicable in this case. One, it only applies in unintentional tort context such as an automobile accident or another unintentional tort.
>
> Malicious prosecution is an intentional tort such as battery or anything like that.
>
> Initially Plaintiff objected to intervening cause being interjected into this case.
>
> Also for the reason that it has a high probability for confusing the jury. No further objection on that instruction. That's it.

*Appellants' Appendix* at 701–02. Appellants are limited to the rationale articulated above as grounds for objecting to the instruction and we address the issue on only that basis.

We observe as an initial matter that the legal principle espoused in this disputed instruction is by no means firmly established under Indiana law. In fact, the following excerpt reflects that our supreme court may regard that principle with a good deal of skepticism:

> Moreover, "[i]n cases involving unlawful acts, intervening causes are especially likely not to be held to preclude liability of the wrongdoer." 74 Am.Jur.2d § 29, 644. . . .
>
> A person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.
>
> Where a person has intentionally invaded the legally protected interests of another, his intention to commit an invasion, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for the resulting unintended harm.
>
> The rule has therefore emerged that the doctrine of superseding cause is inapplicable to willful torts. Gregory G. Sarno, Annotation, *Liability of One Causing Physical Injuries as a Result of Which Injured Party Attempts or Commits Suicide,* 77 A.L.R.3d 311, 349 (1977). In accordance with general authority, the proximate causation concept of superseding causes thus is discarded in favor of a cause-in-fact test.

*Kimberlin v. DeLong,* 637 N.E.2d 121, 126–27 (Ind.1994) (some citations omitted). The foregoing discussion does not constitute a clear rejection of the doctrine of intervening cause in an intentional tort setting, but it surely reflects a hesitance to embrace the argument advanced here by Trump. We need not decide that question, however, because even if the giving of the instruction was error, it did not affect the substantial rights of Appellants and therefore was harmless.

▆▆▆ The essence of a malicious prosecution action rests on the notion that the plaintiff has been improperly subjected to legal process. *City of New Haven v. Reichhart,* 748 N.E.2d 374 (Ind.2001). To prevail, the plaintiff must prove the following elements: (1) The defendant instituted or caused to be instituted an action against the plaintiff; (2) in so doing, the defendant acted with malice; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor. *Id.* "Probable

cause to commence criminal proceedings" in this context exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged. *Conwell v. Beatty,* 667 N.E.2d 768, 778–79 (Ind.Ct.App.1996). "[T]he element of malice may be inferred from a total lack of probable cause, from the failure to make a reasonable or suitable inquiry, and from a showing of personal animosity." *Kroger Food Stores, Inc. v. Clark,* 598 N.E.2d 1084, 1089 (Ind.Ct.App.1992), *trans. denied.*

■■■■ Our courts have held that a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution. *See Conwell v. Beatty,* 667 N.E.2d 768. The plaintiff may rebut such a prima facie case of probable cause by introducing evidence that shows the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing. *Id.* "When a judicial determination of probable cause has been made, the prima facie case cannot be overcome by a showing of a negligent failure to investigate thoroughly where there is some factual basis for bringing a claim. More than mere negligence must be shown to rebut the prima facie case." *Id.* at 778.

We are convinced after reviewing the record that the evidence proffered by Appellants to rebut the prima facie case of probable cause was wholly inadequate to accomplish that end. First, there is no suggestion that the finding of probable cause was induced by false testimony, fraud, or other improper means on the part of any party, let alone Trump. Second, we cannot forget that it was not Trump that instituted or caused to be instituted a prosecution against either Chantala or Glass. *See Conwell v. Beatty,* 667

N.E.2d 768. Rather, Janiczak's independent investigation, conducted under the auspices of the Gaming Commission, provided the impetus for the decision to prosecute. And *that* decision, in turn, was made by the Lake County Prosecutor's Office after reviewing Janiczak's investigation, and assessing the strength of the evidence gathered thereby. *See id.* The record indicates that Trump was not even consulted, much less a driving force, in the Prosecutor's Office's decision to charge Appellants.

To rebut the prima facie case, Appellants point out that Chantala won a significant amount of money while playing Mini Baccarat at Trump. The implication is that, in singling out Glass and Chantala for prosecution, Trump was motivated by its own financial self-interest. Whatever may be said of the plausibility and merits of this implication, it does not negate the considerable evidence supporting the finding of probable cause. That evidence included the following: (1) Chantala played for significantly higher than normal stakes in the Mini Baccarat game while Glass was dealing—and won; (2) when Glass took over as dealer on one occasion, he reserved spot number one, which was occupied several minutes later by Chantala; (3) Glass placed the shoe in an unusual position while dealing, one that might allow the players—and in particular the player in position one, where Chantala was sitting— to glimpse the cards as or before they were dealt; (4) Glass was manipulating the shoe in a manner that was "very much" unusual, *Transcript* at 542, and suggestive of cheating; (5) no other dealer dealt in this fashion, and Glass did not deal in this manner when Chantala was not playing; (6) on the night in question, "everytime [sic] Mr. Glass would go on break … [Chantala] would stop playing at [Glass's] table and go elsewhere during that time", *Transcript* at 602; and (7) on one occasion, Glass spoke with Chantala upon leaving

the casino, and on another occasion Glass spoke with Chantala's girlfriend for several minutes after leaving the casino.

In summary, the finding of probable cause was critical both to Trump's defense and to Appellants' claim for malicious prosecution. A finding of probable cause would negate the second and third elements of a claim of malicious prosecution. In view of the judicial finding of probable cause to support the arrest warrant, which thereby established a prima facie case of probable cause in this lawsuit, it was incumbent upon Appellants to present evidence demonstrating that probable cause was lacking. Appellants sought to meet this burden by offering innocent explanations for the anomalies set forth above, as well as implying that Trump wanted to oust Glass and Chantala from the casino because Chantala was winning. We conclude that this evidence was not of such a character that it would have diluted the evidence demonstrating probable cause. This assessment is true regardless of whether the court instructed the jury on the doctrines of intervening or superceding cause. In order to prevail, Appellants would have had to convince the jury that probable cause did not exist to, ultimately, charge Appellants with the aforementioned offenses. The evidence of record reveals that Appellants could not carry that burden. Therefore, even assuming for the sake of argument that the court erred in instructing the jury as Appellants contend, such did not affect the Appellants' substantial rights because the error would not have affected the ultimate verdict. Therefore, any error is harmless.

Judgment affirmed.

RILEY, J., and SULLIVAN, J., concur.