**FOR PUBLICATION**



FILED
Jun 11 2014, 6:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**KEVIN W. BETZ**
**SANDRA L. BLEVINS**
**JAMIE A. MADDOX**
Betz + Blevins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**JAMES S. STEPHENSON**
**IAN L. STEWART**
Stephenson Morow & Semler
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JEFFREY M. MILLER, and )
CYNTHIA S. MILLER, )
)
    Appellants-Plaintiffs, )
)
        vs. ) No. 49A04-1309-PL-451
)
CENTRAL INDIANA COMMUNITY )
FOUNDATION, INC., and )
BRIAN PAYNE, )
)
    Appellees-Defendants. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1003-PL-14761

**June 11, 2014**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

From 1994 until his retirement in 2008, Appellant-Plaintiff Jeffrey Miller ("Miller") was the president of Junior Achievement of Central Indiana ("JACI"). After his retirement, Miller acted as president of the Experiential Learning and Entrepreneurship Federation ("ELEF"), which is separate from but works with JACI. From approximately August of 2009 until late January or early February of 2010, Miller negotiated with the City of Indianapolis (the "City") regarding a potential employment opportunity in the Mayor's Office. Miller was subsequently notified that he would not be offered the negotiated position.

On March 31, 2010, Miller, along with his wife, Appellant-Plaintiff Cynthia Miller ("Cynthia"), filed suit against numerous parties, including Appellees-Defendants the Central Indiana Community Foundation, Inc. ("CICF") and Brian Payne ("Payne"), whom they sued both individually and in his capacity as President and CEO of CICF, alleging, among other things, defamation and tortious interference with a business relationship. The instant appeal concerns only Miller's and Cynthia's (collectively "the Millers") claims against CICF and Payne. CICF and Payne filed a motion for summary judgment. Following a hearing on CICF's and Payne's motion, the trial court granted summary judgment in favor of CICF and Payne. On appeal, the Millers contend that the trial court erred in granting summary judgment in favor of CICF and Payne. We affirm.

**FACTS AND PROCEDURAL HISTORY**

**A. Relevant Facts**

*1. Facts Relating to CICF and the Indianapolis Foundation*

2

CICF is a collaborative effort between the community foundations serving Marion and Hamilton Counties. CICF focuses on overall foundation governance and operations, acting as a "holding company" for its family of funds. Appellants' App. p. 197. The Indianapolis Foundation is a public charity and an affiliate of CICF. Payne is the President and CEO of both CICF and the Indianapolis Foundation.

The Indianapolis Foundation has six trustees. Two trustees are appointed by the Mayor of Indianapolis, two are appointed by the Marion County Circuit Court Judge, and two are appointed by the United States District Court which presides in Indianapolis. CICF's board of directors is comprised of the trustees of the Indianapolis Foundation, three Legacy Fund officers, and twelve members that are self-elected by the CICF board of directors.

### 2. Facts Relating to Miller's Involvement with JACI, ELEF, and Performance Professionals

Miller was the President and CEO of JACI from September of 1994 until he retired on December 31, 2008. In 1994, Miller became President of the Foundation for Economic Literacy. The Foundation for Economic Literacy subsequently changed its name to the Junior Achievement of Central Indiana Foundation. While known as the Junior Achievement of Central Indiana Foundation, the entity's purpose was to benefit JACI, and many of the members of its board of directors overlapped with JACI's board of directors.

On August 28, 2003, under Miller's leadership, the Junior Achievement of Central Indiana Foundation changed its name to ELEF. This was done in order to separate the entity from JACI. At the same time, there was a change in ELEF's articles of incorporation expanding ELEF's purpose from solely promoting JACI to the more general purpose of

3

promoting education programs. After 2003, ELEF had its own independent and separate board of directors which no longer overlapped with JACI's board of directors. Under the 2003 changes, ELEF was no longer tied exclusively to JACI. Throughout 2009, Miller continued to further separate any connection between ELEF and JACI. Miller remained President of ELEF until he retired from the position in February of 2010.

Performance Professionals, Inc. is an Indiana corporation formed and incorporated in January of 2009. At all times relevant to this appeal, Miller owned fifty percent of Performance Professionals. Cynthia owned the other fifty percent of Performance Professionals. In 2009, ELEF was Performance Professionals' only client.

On January 22, 2009, ELEF entered into a contract with Performance Professionals. Under the terms of the contract, Miller retained the title of President and CEO of ELEF. Miller's role was to help transition JACI to a new President and CEO, help coordinate the Business Hall of Fame, oversee a catering service, and to work on a project involving the Ivy Tech Culinary Arts and Hospitality Program (the "Ivy Tech Culinary Project"). The contract was for one year and provided that Performance Professionals would be paid $23,400 per month for the first six months and $11,000 per month for the second six months. Miller drafted the ELEF/Performance Professionals contract. JACI was not a party to the contract and did not sign the contract.

### 3. Facts Relating to the Ivy Tech Culinary Project

In November of 2007, Miller made a proposal on behalf of JACI to the Glick Company and the Glick Foundation to solicit two million dollars in funding for the Ivy Tech

4

Culinary Project. On May 21, 2008, the Glick Fund issued a two million dollar grant to JACI for the sole purpose of construction of a building to be used for the Ivy Tech Culinary Arts Project. The Glick Fund is a fund of CICF that was established by Gene and Marilyn Glick (collectively, the "Glicks") in 1998 to support a variety of causes in central Indiana.

Initially, the grant awarded by the Glick Fund (the "Glick grant") was a one-to-one matching grant that had a two-step process for release of funds, requiring (1) a building expense, and (2) a matching donation from a separate entity. JACI was to send reports to CICF evidencing the pledges received. Before construction of the building began, Miller requested to have the Glick grant funds released quarterly based only on when matching pledges were received, and on September 17, 2008, the Glick grant was amended to reflect that request. Funds for the building project from the Glick grant were thereafter released only upon CICF receiving evidence of matching pledges.

On September 29, 2008, Miller submitted JACI's first request for the release of funds from the Glick grant in the amount of $275,000. Among the matching pledges submitted to unlock the Glick grant payment was a pledge from ELEF in the amount of $65,000. On October 9, 2008, CICF made the first Glick grant payment with a $275,000 check made out to JACI. Upon receipt of the money, Miller authorized the transfer of the funds from JACI's bank account to ELEF's bank account.[1]

JACI and ELEF had separate bank accounts. ELEF did not have a separate bank account for the Ivy Tech Culinary Project. Once transferred, the Glick grant funds went into

---

[1] At the time, JACI's accounting department also did the accounting for ELEF.

ELEF's general bank account. Of the original $275,000 payment from the Glick grant, roughly $136,000 was used to pay bills associated with the Ivy Tech Culinary Project and roughly $140,000 remained in ELEF's general bank account.

On December 29, 2008, Miller submitted JACI's next request for the release of funds from the Glick grant in the amount of $113,000. Among the matching pledges submitted to unlock the Glick grant payment was a pledge from ELEF in the amount of $5000. However, ELEF never paid JACI the $5000, which instead remained in ELEF's general bank account. On February 5, 2009, CICF made the second Glick grant payment with a $113,000 check made out to JACI. Upon receipt of the funds, the $113,000 was transferred from the JACI bank account to ELEF's general bank account. Miller authorized this transfer despite the fact that he no longer held a position with JACI.[2]

On March 31, 2009, Miller submitted JACI's third request for the release of funds from the Glick grant in the amount of $40,000. By this point, $246,503.08 of the $388,000 previously received from the Glick fund had been paid out for construction costs. There were no outstanding bills, and $141,496 of the funds received pursuant to the Glick grant remained in ELEF's general bank account. On April 23, 2009, CICF made the third Glick grant payment with a $40,000 check made out to JACI. Miller authorized the $40,000 check to be transferred from JACI to ELEF. Miller does not recall whether he ever discussed the transfer of the funds from JACI to ELEF with JACI's new President and CEO, Jennifer Burk.

From April to July 2009, Burk repeatedly told Miller that she did not want the Ivy

---

[2] Again, Miller retired from his position at JACI on December 31, 2008, but remained president of ELEF until February of 2010.

6

Tech Culinary Project to proceed. By June 15, 2009, Miller sought to remove the matching funds requirement from the Glick grant. Miller wanted the Glicks to agree to sign a pledge agreement for the remaining $1,572,000. Miller also wanted the proposed pledge agreement to bear the date of June 30, 2009, in order to show income on the balance sheets before the end of ELEF's and JACI's fiscal years because doing so would allegedly help with bond financing.

On August 19, 2009, Miller submitted two invoices from Performance Professionals to CICF. Both invoices were personally prepared by Miller. The first invoice, dated April 1, 2009, was for $56,160 and claimed to be for work performed in September through December of 2008. However, Performance Professionals did not exist in 2008 as it was not formed until 2009. The second invoice, dated June 30, 2009, was for $84,240.

On August 25, 2009, CICF notified Miller that it did not consider the expenses from Performance Professionals to be reimbursable expenses. Miller subsequently informed CICF that he would remove the Performance Professional expenses from the submitted invoices. However, when Miller made a later request for a release of funds from the Glick grant, his request showed that he had used earlier Glick grant payments to pay the two Performance Professionals invoices. By September 30, 2009, $140,400 of the funds received from the Glick grant had been paid to Performance Professionals.

On September 2, 2009, Miller sent emails to CICF and Burk expressing his opinion that it was inappropriate for Burk to have conversations with CICF regarding the Ivy Tech Culinary Project. On September 8, 2009, Miller requested to pick up the next Glick grant

7

payment in person at CICF instead of having it mailed to JACI. Also on September 8, 2009, CICF released a Glick grant payment in the amount of $204,538.45 to Miller. The payment was in the form of a check made payable to JACI. The check was endorsed with instructions for the check to be deposited in ELEF's bank account. Miller subsequently admitted that the handwritten endorsement on the check "could" be his handwriting. Appellants' App. p. 282.

On September 8, 2009, CICF issued a letter modifying the Glick grant. This modification removed the matching funds requirement, but the Glick grant still required that there be qualified construction/project expenses incurred and owed, evidence of sufficient funds for the completion of the Ivy Tech Culinary Project, and completion of the project in the time agreed to by Ivy Tech for a release of funds.

On September 30, 2009, Miller sent an email to the Glicks and CICF directing them to send all future correspondence to ELEF. In making this request, Miller indicated that he perceived that there was confusion on the part of CICF as to which entity it should be dealing with on the Ivy Tech Culinary Project. This was the first request by Miller that correspondence be sent to ELEF. As of that date, CICF had not addressed any correspondence to ELEF.

On or about September 30, 2009, Miller submitted a request for the release of funds from the Glick grant in the amount of $132,921.96. Miller again requested that all future correspondence be addressed to ELEF. Miller also requested to pick up the check in person from the CICF offices rather than having it mailed. CICF advised Miller that the funds could be transferred more quickly by electronic transfer, but, because the grant went to JACI, Burk

8

would have to sign the necessary forms for the electronic transfer. CICF further advised that the check would be mailed if Burk did not sign the necessary forms.

Miller responded, stating that the funds should instead go to the Junior Achievement Endowment Fund, care of ELEF; that the Glick grant should be placed in ELEF's name; and that all future correspondence should go to ELEF. This was the first time that Miller reported to CICF that the Glick grant funds should be paid directly to ELEF. CICF informed Miller that a new grant application would need to be submitted if there was a desire to change the organization name on the Glick grant.

On October 7, 2009, ELEF conducted a board meeting. During this meeting, it decided that ELEF and JACI would further separate the organizations by separating the accounting between the two organizations. The further separation was sought because of trust issues that had arisen between ELEF and JACI.

On October 9, 2009, CICF made a Glick grant payment to Burk with a $132,921.96 check made payable to JACI. The check was deposited directly into JACI's bank account. Miller never saw the check and does not know if it was transferred to ELEF or remained in JACI's bank account.

On November 10, 2009, Miller wrote an email to the Glick Foundation and CICF to attempt to clear up confusion about the relationship between ELEF and JACI. Miller attached a letter to the email that was purported to have been written on June 1, 2008, from Miller to Gary Aletto, the chairman of the ELEF board of directors. The letter stated that JACI was transferring the funds received from the Glick Fund to ELEF, where they would

9

become assets of an irrevocable fund owned and managed by ELEF.

Miller did not produce the Aletto letter to the Glick Foundation or CICF until November of 2009. Miller never asked permission from the Glick Foundation or CICF before he transferred the control of the Glick grant payments from JACI to ELEF, and he received no formal approval from the Glicks, the Glick Foundation, or CICF to do so. In addition, the JACI board of directors never voted to affirm the transfer of the Glick grant to ELEF. Because of the transfer, JACI had no control over what ELEF did with the Glick grant funds.

Also on November 10, 2009, Payne, acting in his capacity as President of CICF, informed Miller and ELEF that all grant payments for the Ivy Tech Culinary Project were going to be withheld until after a meeting during which the interested parties would provide CICF with a better understanding of the relationship between ELEF and JACI. On November 25, 2009, CICF notified JACI by letter that it was suspending payments on the Ivy Tech Culinary Project. The November 25, 2009 letter outlined CICF's concerns which included:

> (a) CICF made the grant to JACI but, at some point after the grant was awarded and without CICF's approval, the grant funds and the underlying activities for the project were transferred to ELEF;
> (b) JACI reported to CICF that JACI's board of directors did not approve JACI's original acceptance of the Grant award and had not approved JACI's transfer of the grant funds and underlying activities to ELEF;
> (c) JACI reported to CICF that its board of directors was not in control of the Grant funds and was not receiving regular or satisfactory reports from ELEF regarding the status of the [Ivy Tech Culinary Project] or its funding streams;
> (d) JACI had reported to CICF and Glick Fund representatives that it was experiencing financial difficulties and that these challenges might impact the [Ivy Tech Culinary Project] and the ability to secure financing commitments

10

necessary to complete the project and manage it over the long term;
(e) There was a lack of assurance that JACI or ELEF had written commitments for the additional funding that was necessary to complete the [Ivy Tech Culinary Project].

Appellants' App. pp. 198-99. Miller received a copy of the November 25, 2009 letter by the end of November 2009. Miller knew by November 25, 2009, that CICF had concerns about the transfer of the Glick grant from JACI to ELEF.

The Performance Professionals contract with ELEF ended on December 30, 2009, and Miller no longer served as the project coordinator for the Ivy Tech Culinary Project as of that date. On March 3, 2010, Miller filed a $112,800 lien on behalf of Performance Professionals against ELEF for unpaid project management work on the construction that had allegedly been completed on the Ivy Tech Culinary Project. On January 26, 2010, Miller wrote to ELEF board members that JACI had requested that the Ivy Tech Culinary Project stop, and that the project had stopped.

On February 10, 2010, Miller attended an ELEF meeting along with Burk. During the ELEF meeting, there was extensive discussion about the hold on the Glick grant funds, JACI's response to CICF, and Burk's opposition to the Ivy Tech Culinary Project. It was also announced during the meeting that Miller was stepping down as ELEF president effective February 12, 2010. Miller told ELEF board members Aletto and Robert Palmer before the meeting that he was stepping down as ELEF president because he was going to work for the Mayor's Office.

*4. Facts Relating to CICF's Request for an
Audit of Funds Paid from the Glick Fund*

11

In late 2009 or early 2010, CICF asked for an audit of the funds that had been disbursed from the Glick fund. An audit that was performed by Greenwalt CPA revealed discrepancies, variances, and irregularities with the Ivy Tech Culinary Project, but reached no conclusion as to whether there was any money missing from the project. On April 26, 2010, JACI agreed to a mutual termination of the Glick grant.

It was obvious to Miller by February of 2010, that the Glicks and CICF had concerns about the transfer of the Glick grant from JACI to ELEF. At the time that Miller left his position as president of ELEF on February 12, 2010, the issues regarding the funding of the Ivy Tech Culinary Project had not been resolved and funding for the project had not resumed.

### 5. *Facts Relating to Miller's Potential Employment Opportunity with the City*

Miller initiated discussion about a potential employment opportunity with Indianapolis Mayor Greg Ballard's former chief-of-staff, Chris Cotterill, in August of 2009. These discussions continued into late January or early February of 2010. During this period, Miller told Aletto, Palmer, and others that he anticipated being offered a position in the Mayor's Office.

Miller's discussions with Cotterill revealed that, at the time, there were no open positions, and, if an offer of employment was extended, a position would have to be created. Miller and City personnel exchanged emails about what potential job duties might entail but Miller was never provided with a finalized job description. One of the potential duties discussed was for Miller to work to improve the City's relationship with CICF. Miller acknowledged to City officials that he might have a problem satisfying that potential duty.

12

While Miller's discussions with the City were ongoing, Cotterill's wife, an attorney at an Indianapolis law firm, told Cotterill that she had heard that Miller had been telling people that he had a job in the Mayor's Office. Cotterill's wife also told Cotterill about a potential audit of JACI. Both of these facts caused Coterill concern. Cotterill was displeased that Miller was telling people that he would be working for the Mayor, as no offer of employment had been extended. In Cotterill's opinion, discretion was one of the minimum requirements of working in the Mayor's Office, and he believed that Miller failed that requirement by telling people that he would be working in the Mayor's Office before any offer of employment had been extended.

By February 19, 2010, all discussions between Miller and the City were put on hold, and Cotterill sent Miller an email stating that he had heard of a potentially impending lawsuit involving JACI and/or Miller. Cotterill's statement was derived solely from the information that he had received from his wife and, based on this information, Cotterill was no longer actively considering Miller for any position. On March 19, 2010, Miller spoke with Cotterill by telephone. Miller surreptitiously recorded the conversation. This awkward conversation with Miller together with Miller's response after the conversation confirmed Cotterill's prior decision not to offer Miller a position in the Mayor's Office.

Furthermore, any hiring decision involving Miller would ultimately have had to have been made by Mayor Ballard. Mayor Ballard neither interviewed Miller nor signed off on the creation of a position for Miller. No job offer was ever extended to Miller, and Miller was never hired by the City. Cotterill never even spoke to Mayor Ballard about Miller until

13

after an Indiana Business Journal ("IBJ") article about the underlying lawsuit was published on April 2, 2010.

### 6. *Facts Relating to Statements Made by Brian Payne*

On March 9, 2010, Cotterill engaged in a brief conversation with Payne following a meeting about the Indianapolis Cultural Trail. Cotterill initiated the conversation which lasted approximately one minute. Payne did not seek out Cotterill. Rather, Cotterill sought out Payne in an attempt to confirm information about JACI being the subject of an audit.

During this conversation, Cotterill told Payne that he was "hearing concerns that CICF might have concerns about [JACI]" and asked Payne "Can you tell me about it?" Appellants' App. p. 231. Payne replied that the "Glick family [had] asked [him] to look at it and to audit them or something like that." Appellants' App. p. 231. Payne confirmed that CICF was in the process of auditing JACI due to the Glicks' concerns of money being spent in ways not consistent with the terms of the grant, misappropriation of funds, or money moving around in an improper manner. Cotterill, however, testified during his deposition that Payne never told him that Miller was the one who may have misappropriated funds or moved money around improperly. Cotterill never spoke with anyone else from CICF about Miller, JACI, or the Ivy Tech Culinary Project.

Further, when Cotterill asked Payne about Miller specifically, Payne replied "I have nothing bad to say about Jeff Miller." Appellants' App. p. 241. Payne did not say anything negative about Miller to Cotterill. He did not tell Cotterill that Miller, in his professional or individual capacity, was going to be sued or prosecuted; had moved money around

14

improperly; or had misappropriated funds. Payne did not tell Cotterill that CICF had a problem with Miller.

7. *Facts Relating to Media Reports Concerning the Ivy Tech Culinary Project*

A story regarding the Ivy Tech Culinary Project was published in the IBJ on March 18, 2010. The article reported that CICF had halted payments on the Glick grant. The article also contained a quote that was provided to the reporter by and attributed to Miller. No statement that was attributed to Payne in the article mentioned Miller.

The Indianapolis Star ran a story about the Ivy Tech Culinary Project on March 19, 2010. Miller was not mentioned in the text of the Indianapolis Star article. Another news article about the Ivy Tech Culinary Project was published in the IBJ on March 27, 2010. Miller was interviewed for this article.

## B. Procedural History

On March 31, 2010, the Millers filed suit against numerous parties, including CICF and Payne. With respect to CICF and Payne, the Millers alleged that CICF and Payne had (1) tortiously defamed Miller; (2) committed a tortious invasion of Miller's privacy; (3) intentionally inflicted emotional distress upon Miller; (4) committed a tortious interference with Miller's business relationship with the City; and (5) engaged in a civil conspiracy against Miller. The Millers also alleged that Cynthia suffered a loss of consortium as a result of CICF's and Payne's actions.

On January 25, 2013, CICF and Payne collectively filed a motion for summary judgment. The Millers opposed CICF's and Payne's request for summary judgment. The

trial court conducted a hearing on the matter on July 1, 2013. Thereafter, on August 16,

2013, the trial court issued an order in which it granted summary judgment in favor of CICF

and Payne. This appeal follows.

## DISCUSSION AND DECISION[3]

The Millers contend that the trial court erred in granting summary judgment in favor

of CICF and Payne. Specifically, the Millers contend that summary judgment was

inappropriate because issues of material fact exist with regard to the following: (1) Miller's

defamation claim; (2) Miller's invasion of privacy by false light claim; (3) Miller's

intentional infliction of emotional distress claim; (4) Miller's tortious interference with a

business relationship claim; (5) Miller's civil conspiracy claim; and (6) Cynthia's loss of

consortium claim. Miller also contends that summary judgment was inappropriate because

his claims were not barred by the Anti-SLAPP[4] statute.

### A. Standard of Review

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. When reviewing a decision to grant summary judgment, this court applies the same standard as the trial court. *Best Homes, Inc. v. Rainwater*, 714 N.E.2d 702, 705 (Ind. Ct. App. 1999). We must determine whether there is a genuine issue of material fact requiring trial, and whether the moving party is entitled

---

[3] We heard oral argument in this matter on May 13, 2013, and wish to thank counsel for their presentations. In addition, we note that counsel for the Millers requested permission to file a supplemental appendix on the morning of oral argument. Counsel for CICF and Payne objected to the request, arguing that the information contained in the supplemental appendix was not included in the designated evidence before the trial court and, as such, could not be considered on appeal. Concluding that counsel for the Millers does not claim, much less establish, that the material included in the supplemental appendix was properly designated before the trial court below, we deny the request to file the supplemental appendix.

[4] SLAPP is an acronym for "strategic lawsuit against public participation." *Poulard v. Lauth*, 793 N.E.2d 1120, 1122 n.2 (Ind. Ct. App. 2003).

16

to judgment as a matter of law. *Id.* Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. *Id.*

A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind. Ct. App. 1996). Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Best Homes, Inc.*, 714 N.E.2d at 706 (quoting *Barnes v. Antich*, 700 N.E.2d 262, 264-65 (Ind. Ct. App. 1998)).

*Heritage Dev. of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 887-88 (Ind. Ct. App. 2002). Upon review, we consider only "those portions of the record that were specifically designated to the trial court" which "comprise[s] the entire record for appellate review." *Mid State Bank v. 84 Lumber Co.*, 629 N.E.2d 909, 912 (Ind. Ct. App. 1994) (citing *Jackson v. Blanchard*, 601 N.E.2d 411, 415 (Ind. Ct. App. 1992)).

## B. Analysis

### 1. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to Miller's Defamation Claim

Miller contends that the trial court erred in granting summary judgment in favor of CICF and Payne because an issue of material fact exists as to whether Payne, both individually and in his capacity as President and CEO of CICF, defamed him. For their part, CICC and Payne assert that the award of summary judgment was proper because the designated evidence leads only to the conclusion that Payne did not make any defamatory comments about Miller.

17

### i. Law Relating to Defamation

Defamation is "that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), *trans. denied*. To establish defamation, a plaintiff must prove the following elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Id*.

*Shine v. Loomis*, 836 N.E.2d 952, 956 (Ind. Ct. App. 2005), *trans. denied*. "A communication is defamatory per se if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000). "In addition, the defamatory nature of the communication must appear without resort to extrinsic facts or circumstances." *Id*. (citing *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*).

If the plaintiff can show that the statement was in fact defamatory per se, he still needs to demonstrate publication, falsity, and malice in order to maintain a successful defamation action. *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 550 (Ind. Ct. App. 2012). Damages, however, may be presumed in an action for defamation per se "as a natural and probable consequence of the per se defamation." *Id*. (internal citation and quotation omitted).

Any statement actionable for defamation must not only be defamatory in nature, but false. *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006). The determination of whether a communication is defamatory is a question of law. *Id*. A defendant in a defamation case is entitled to summary judgment if he demonstrates that the undisputed material facts negate at least one element of the plaintiff's claim. *Shine*, 836

N.E.2d at 956. This court has previously concluded that the chilling effect of a defamation suit on the exercise of First Amendment rights calls for a judicial attitude more favorable to summary judgment than in the ordinary case. *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993) (citing *Fadell v. Minneapolis Star and Tribune Co.*, 425 F.Supp. 1075, 1085 (N.D. Ind. 1976)), *trans. denied*.

Furthermore, a plaintiff who sues for defamation must set out the alleged defamatory statement in his complaint. *Haegert v. McMullan*, 953 N.E.2d 1223, 1230 (Ind. Ct. App. 2011) (citing *Trail*, 845 N.E.2d at 136-37).

> There is sound reason for this policy, as the absence of a statement in the complaint works a detriment on both the court and the defendant. The court is handicapped without the statement since, without it, the court cannot actually determine if the statement is legally defamatory. *Journal-Gazette Co., v. Bandido's Inc.*, 712 N.E.2d 446, 457 (Ind. 1999). The defendant is placed on an unfair footing since the absence of the statement denies [him] the opportunity to prepare appropriate defenses.

*Trail*, 845 N.E.2d at 137. When specific statements that are alleged to be defamatory have not been sufficiently identified in a plaintiff's complaint, an award of summary judgment for the defendant is proper. *Haegert*, 953 N.E.2d at 1230.

### ii. Analysis

Initially, we note that Miller argues four instances of defamation by Payne or representatives of CICF on appeal. However, our review of the record indicates that the only allegedly defamatory comments identified in Miller's complaint are the comments made by Payne to Cotterill on March 9, 2010. Miller appears to have argued the three additional allegedly defamatory statements by representatives of CICF for the first time in their pleading

19

in opposition to CICF's and Payne's motion for summary judgment. In light of our conclusion in *Haegert* that summary judgment is proper when alleged defamatory statements have not been sufficiently identified in the plaintiff's compliant, the trial court's award of summary judgment is proper with regard to any statements other than those made by Payne to Cotterill on March 9, 2010. *See id.* As such, on appeal, we need only review whether summary judgment was proper with regard to the statements that were made by Payne to Cotterill on March 9, 2010.

The designated evidence establishes that Cotterill engaged Payne in a short conversation following a meeting about the Indianapolis Cultural Trail on March 9, 2010. Cotterill sought out Payne in an attempt to confirm information that he had received from his wife about JACI being the subject of an audit. During this conversation, Cotterill stated that he was "hearing concerns that CICF might have concerns about [JACI]" and asked Payne "Can you tell me about it?" Appellants' App. p. 231. Payne replied that the "Glick family [had] asked [him] to look at it and to audit them or something like that." Appellants' App. p. 231. Payne confirmed that CICF was in the process of auditing JACI due to the Glicks' concerns of money being spent in ways not consistent with the terms of the grant, misappropriation of funds, or money moving around in an improper manner. Cotterill, however, testified during his deposition that Payne never told him that Miller was the one who may have misappropriated funds or moved money around improperly. Cotterill never spoke with anyone else from CICF about Miller, JACI, or the Ivy Tech Culinary Project. Further, when asked by Cotterill about Miller, Payne specifically replied, "I have nothing bad

20

to say about Jeff Miller," and the evidence designated before the trial court is devoid of any evidence that Payne said anything negative about Miller to Cotterill.[5] Appellants' App. p. 241.

The designated evidence further establishes that on March 9, 2010, at the time that Cotterill and Payne engaged in the above-discussed conversation, JACI was the subject of an audit, as the audit of JACI's use of the Glick grant funds was ongoing. The audit was requested by the Glicks due to concerns of money being spent in ways not consistent with the terms of the Glick grant or potential misappropriation of funds. Thus, Payne's statements to Cotterill regarding the audit of the funds received by JACI under the Glick grant were true. As a result, these statements were not defamatory in nature.

In addition, the evidence designated before the trial court below does not contain any evidence that Payne made any comments regarding Miller that can reasonably be said to have contained defamatory imputation. Again, in making the above-stated statements to Cotterill, Payne does not impute that Miller committed professional misconduct. Instead, Payne specifically stated that he had "nothing bad to say about Jeff Miller." Appellants' App. p. 241. Payne did not tell Cotterill that Miller, in his individual capacity, was going to be sued or prosecuted, that Miller had moved money around improperly, that Miller had

---

[5] During oral argument, counsel for Miller repeatedly referred to statements by Cotterill that were allegedly made during a conversation between Miller and Cotterill which Miller recorded without Cotterill's knowledge. Miller's counsel included a disk including this recording in Miller's appendix and cited to the page in the appendix where the recording could be found several times during oral argument. However, review of the record reveals that neither the disk containing the recorded conversation nor a written transcript of its contents was designated as evidence before the trial court during the summary judgment proceedings. As such, its contents should not be considered during resolution of the instant appeal. *See Mid State Bank*, 629 N.E.2d at 912.

misappropriated funds, or that CICF had a problem with Miller. The statements merely seem to accurately indicate that the Glicks had expressed concern to CICF about whether the funds were being used in accordance with the terms of the Glick grant and that, per the Glicks' request, CICF intended to audit JACI. CICF did in fact complete the audit to which Payne referred.

Upon review, we conclude that no issue of material fact remains that would preclude summary judgment because no issue of fact remains as to whether Payne defamed Miller and the designated evidence cannot support a determination that Payne defamed Miller. Accordingly, we further conclude that the trial court properly granted summary judgment in favor of CICF and Payne in this regard.

### 2. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to Miller's Claim of Invasion of Privacy by False Light

Miller also contends that the trial court erred in granting summary judgment in favor of CICF and Payne because an issue of material fact exists as to whether Payne and CICF unreasonably placed him in a false light before the public. For their part, CICF and Payne assert that the award of summary judgment was proper because Payne's statements were true.

#### i. Law Relating to Invasion of Privacy by False Light

"The tort of invasion of privacy includes four distinct injuries: (1) intrusion upon seclusion, (2) appropriation of likeness, (3) public disclosure of private facts, and (4) false-light publicity." *Newman v. Jewish Cmty. Ctr. Assn. of Indpls.*, 875 N.E.2d 729, 736 (Ind. Ct. App. 2007), *trans. denied*. In *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d

22

514, 524 (Ind. Ct. App. 2001), *trans. denied*, this court quoted the Restatement (Second) of Torts which sets forth the express elements of the tort of invasion of privacy by false light as follows:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>   (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>   (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

(quoting RESTATEMENT (SECOND) OF TORTS § 652E (1977)).

The tort of invasion of privacy is similar to defamation but reaches different interests. *Newman*, 875 N.E.2d at 743. "Defamation reaches injury to reputation, while privacy actions involve injuries to emotions and mental suffering." *Id*. This court has described invasion of privacy by false light as "'publicity that unreasonably places the other in a false light before the public.'" *Id*. (quoting *Lovings v. Thomas*, 805 N.E.2d 442, 446 (Ind. Ct. App. 2004)). Like a claim of defamation, the plaintiff cannot succeed on a claim of invasion of privacy by false light if the alleged communication is accurate or true. *Id*. (citing *Branham*, 744 N.E.2d at 525).

## ii. Analysis

In making this claim, Miller does not point to any specific comments made by Payne which allegedly invaded his privacy by placing him in a false light. Miller only refers generally to "Payne's [p]ublished [s]tatements." Appellants' Br. p. 28. Again, the only statements mentioned with any degree of specificity by Miller were those attributed to Payne

23

during a brief conversation with Cotterill on March 9, 2010.

Again, a plaintiff cannot succeed on a claim of invasion of privacy by false light if the alleged communication is accurate or true. *Newman*, 875 N.E.2d at 743 (citing *Branham*, 744 N.E.2d at 525). Thus, when there is no false statement, there can be no false light.

In the instant matter, the designated evidence relating to Payne's statements to Cotterill establishes that Cotterill engaged Payne in a short conversation following a meeting about the Indianapolis Cultural Trail on March 9, 2010. Cotterill sought out Payne in an attempt to confirm information he had received from his wife about JACI being the subject of an audit. When Cotterill asked Payne about the potential audit of JACI, Payne confirmed that JACI was the subject of an audit due to the Glicks' concerns of money being spent in ways not consistent with the terms of the grant, misappropriation of funds, or money moving around in an improper manner. Appellants' App. p. 231. When asked specifically about Miller, Payne replied "I have nothing bad to say about Jeff Miller," and the record is devoid of any designated evidence suggesting that Payne said anything negative about Miller to Cotterill. Appellants' App. p. 241. In addition, the designated evidence demonstrates that Cotterill testified during his deposition that Payne never told him that Miller was the one who may have misappropriated funds or moved money around improperly. In light of our conclusion above that the statements made by Payne to Cotterill were true at the time the statements were made, we conclude that the award of summary judgment to CICF and Payne on the instant claim was proper because no issue of material fact remains, and the only reasonable interpretation of the designated evidence is that Payne did not invade Miller's

privacy by placing him in a false light.

### 3. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to Miller's Claim of Intentional Infliction of Emotional Distress

Miller also contends that the trial court erred in granting summary judgment in favor of CICF and Payne because an issue of material fact exists as to whether Payne's alleged conduct was "extreme and outrageous." Appellants' Br. p. 27. Specifically, Miller claims that Payne's conduct was "extreme and outrageous" because Payne "continued his defamation campaign after learning from the procedural review/audit that there was no missing money." Appellants' Br. p. 27. For their part, CICF and Payne assert that the trial court properly granted their request for summary judgment in this regard.

### i. Law Relating to Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress is committed by "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another ...." *Ledbetter v. Ross*, 725 N.E.2d 120, 123-24 (Ind. Ct. App. 2000) (quoting *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)); *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000). The intent to harm emotionally constitutes the basis of the tort. *Ledbetter*, 725 N.E.2d at 124; *Pohle*, 724 N.E.2d at 659; *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999). Thus, the elements of the tort are: a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Bradley*, 720 N.E.2d at 752.

The requirements to prove this tort are "rigorous." *Ledbetter*, 725 N.E.2d at 124 (quoting w. Page Keeton Et Al., Prosser and Keeton on the Law of Torts, § 12 at 61 (5th ed.1984)). Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. *Id*.

In *Bradley*, 720 N.E.2d at 752-53, we quoted with approval the comment to Section 46 of the Restatement (Second) of Torts, which reads:

"d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has

25

been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id*. at 752-53 (Ind. Ct. App. 1999) (quoting restatement (Second) of Torts § 46). What constitutes extreme and outrageous conduct depends, in part, upon prevailing cultural norms and values. *Id.* In the appropriate case, the question can be decided as a matter of law. *See, e.g.*, *Conwell v. Beatty*, 667 N.E.2d 768, 775-77 (Ind. Ct. App. 1996) (no outrageous conduct where sheriff announced deputy's arrest at press conference and refused to assist deputy in completing retirement forms); *Gable v. Curtis*, 673 N.E.2d 805, 809-11 (Ind. Ct. App. 1996) (no outrageous conduct where contractor's wife phoned purchaser seven times in one hour, screaming, threatening to repossess home and to come over, and stating repeatedly that the purchasers "would pay").

*Branham*, 744 N.E.2d at 522-23.

### ii. Analysis

The designated evidence establishes that the audit was ongoing and that preliminary results had revealed potential inconsistencies in the materials submitted for the audit. Contrary to Miller's claim, the only reasonable inference from the designated evidence is that Payne did not continue his alleged "defamation campaign" after learning that there was no missing money. Because this only possible reasonable inference coupled with our above-stated conclusion that the designated evidence could not support a determination that Payne defamed Miller, we conclude that the trial court properly granted summary judgment in favor

26

of CICF and Payne in this regard.

### 4. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to Miller's Claim of Tortious Interference with a Business Relationship

Miller also contends that the trial court erred in granting summary judgment in favor of CICF and Payne because an issue of material fact exists as to whether Payne tortiously interfered with his business relationship with the City. For their part, CICF and Payne assert that the trial court properly granted summary judgment in this regard.

### i. Law Relating to Tortious Interference with a Business Relationship

The elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Levee*, 729 N.E.2d at 222 (citing *Bradley*, 720 N.E.2d at 750). Illegal conduct by the alleged wrongdoer is an essential element of tortious interference with a business relationship. *Id.* This court has previously concluded that defamation does not constitute illegal conduct for the purpose of determining whether one tortiously interfered with the business relationship of another. *Id.*

Further, in determining whether a defendant's conduct is justified,

> the Restatement recommends the consideration of the following factors: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to

27

the interference; and (g) the relations between the parties." [*Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)] (citing Restatement (Second) of Torts § 767 (1977)).

*Haegert*, 953 N.E.2d at 1234. The lack of justification is established "only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another. *Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156-57 (Ind. Ct. App. 2005). "The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Id*. at 157.

### ii. Analysis

For a number of months in late 2009 and early 2010, Miller engaged in discussions with Cotterill about a potential employment opportunity with the City. Miller argues that these discussions were sufficient to establish a business relationship between Miller and the City. CICF and Payne argue that these discussions were not sufficient to establish such a business relationship. However, we need not determine whether these discussions were sufficient to establish a business relationship between Miller and the City because even if said relationship existed, no issue of material fact exists as to whether Payne committed any unjustified interference with said relationship. The designated evidence demonstrates that Payne did not do so.

Again, lack of justification is established "only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Bilimoria Computer Sys.*, 829 N.E.2d at 156-57. The

28

designated evidence does not support a reasonable inference that Payne intentionally, without a legitimate business purpose, interfered with Miller's claimed business relationship with the City. Payne did not seek out Cotterill. Rather, Cotterill sought out Payne for the purpose of verifying information that he had previously been told by his wife. Payne merely responded to questions posed to him by Cotterill. The designated evidence demonstrates that Payne did not elaborate on the situation but rather answered Cotterill's questions without going into too much detail. Payne merely acknowledged that CICF was conducting an audit of JACI at the Glicks' request due to concerns for whether certain funds were being spent in accordance with the terms of the Glick grant. Further, in answering Cotterill's questions, Payne did not allege any wrongdoing by Miller and, when asked about specifically about Miller, merely stated that he had "nothing bad to say" about Miller. Appellants' App. p. 241. Payne's statements were not unjustified as they were not made without a legitimate business purpose and cannot reasonably be found to have been made in a malicious manner directed to injure Miller. *See Bilimoria Computer Sys.*, 829 N.E.2d at 156-57.

Furthermore, the designated evidence does not support a determination that Payne committed any illegal behavior. Again, illegal conduct by the alleged wrongdoer is an essential element of tortious interference with a business relationship. *Levee*, 729 N.E.2d at 222. With respect to the requirement for illegal conduct, Miller claims that Payne's act of defaming Miller, invading Miller's privacy, and intentionally inflicting emotional distress upon Miller demonstrated illegal conduct by Payne. However, as our conclusions above demonstrate, the designated evidence does not support the determination that Payne defamed

29

Miller, invaded Miller's privacy, or intentionally inflicted emotional distress upon Miller.

The trial court properly awarded summary judgment in favor of CICF and Payne on the instant claim because the designated evidence does not support a determination that, and no issue of material fact remains regarding whether, Payne committed an unjustified interference with Miller's claimed business relationship with the City, much less committed any illegal conduct which would support a determination that Payne tortiously interfered with Miller's claimed business relationship with the City.

### 5. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to Miller's Claim that CICF and Payne Were Involved in a Civil Conspiracy Against Him

Miller also contends that the trial court erred in granting summary judgment in favor of CICF and Payne because an issue of material fact exists as to whether CICF and Payne were involved in a civil conspiracy against him. For their part, CICF and Payne assert that summary judgment was proper in this regard.

### i. Law Relating to Claims of Civil Conspiracy

A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means. *Boyle v. Anderson Fire Fighters Ass'n. Local 1262, AFL-CIO*, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986), *trans. denied*; *Sims v. Beamer*, 757 N.E.2d 1021, 1026 n.5 (Ind. Ct. App. 2001). In Indiana, there is no separate civil cause of action for conspiracy. *Sims*, 757 N.E.2d at 1026. However, there is a civil cause of action for damages resulting from a conspiracy. *Id*. Allegations of civil conspiracy sound in tort. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1168 (Ind. 2002). "Unlike criminal conspiracy, '[t]he gist of a civil conspiracy is not the unlawful agreement, but the damage resulting from that agreement.'" *Id*. (quoting 16 AM. JUR.2d, Conspiracy, § 53 at 279 (1998)). In other words, allegations of a civil conspiracy are just another way of asserting a concerted action in the commission of a tort. *Boyle*, 497 N.E.2d at 1079.

30

*K.M.K. v. A.K.*, 908 N.E.2d 658, 663-64 (Ind. Ct. App. 2009).

> It is not necessary in order to establish a conspiracy that there be direct evidence of an agreement. *Tucker et al. v. Hyatt* (1898), 151 Ind. 332, 51 N.E. 469, 44 L.R.A. 129. Rather, a civil conspiracy may be asserted through circumstantial evidence or by averment of isolated or independent facts susceptible of an inference of concurrence of sentiment. *Moore, Trustee, etc. v. Fletcher, etc. Admrs.* (1964), 136 Ind. App. 478, 196 N.E.2d 422 (*transfer denied*).

*Lake Mortgage Co., Inc. v. Fed. Nat. Mortg. Ass'n*, 159 Ind. App. 605, 612, 308 N.E.2d 739, 744 (1974). However, an allegation of civil conspiracy will not survive based only upon impermissible speculation. *See generally Shepard by Shepard v. Porter*, 679 N.E.2d 1383, 1390 (Ind. Ct. App. 1997).

### ii. Analysis

Again, a claim of civil conspiracy is not an independent cause of action. *Winkler*, 638 N.E.2d at 1234. As such, a claim of civil conspiracy must be considered together with an underlying alleged tort. *See id*. Thus, because we have concluded that an award of summary judgment was proper for each of the underlying torts alleged by Miller, we also conclude that the trial court properly granted summary judgment in favor of CICF and Payne in this regard.

### 6. Whether the Trial Court Erred in Determining that Summary Judgment Was Appropriate with Regard to the Cynthia's Claim of Loss of Consortium

Cynthia contends that the trial court erred in granting summary judgment in favor of CICF and Payne on her loss of consortium claim. For their part, CICF and Payne assert that summary judgment was proper in this regard.

### i. Law Relating to Claims of Loss of Consortium

A claim of loss of consortium is derivative in nature. *Nelson v. Denkins*, 598 N.E.2d 558, 563 (Ind. Ct. App. 1992). "[A] cause of action for loss of consortium derives its viability from the validity of the claim of the injured spouse against the wrongdoer." *Bd. of Comm'rs of Cass Cnty. v. Nevitt*, 448 N.E.2d 333, 341 (Ind. Ct. App. 1983). "Absent an actionable injury to one spouse, the other spouse cannot recover for loss of consortium." *Id*. "Thus, where the contested injuries were not caused by any tortious misconduct of the defendant, or where the injured spouse's cause of action has been abrogated, the injured spouse has no valid claim, and a claim for loss of consortium is also barred." *Id*.; *see also Branham*, 744 N.E.2d at 525 (providing that where Husband's host tort claims fail, Wife's loss of consortium claim also fails).

## ii. Analysis

Again, a claim of loss of consortium is a derivative claim and "absent actionable injury to one spouse, the other spouse cannot recover for loss of consortium." *Nevitt*, 448 N.E.2d at 341. Thus, because we conclude that summary judgment was proper on each of Miller's underlying tort claims, we further conclude that an award of summary judgment was proper on Cynthia's loss of consortium claim.

## IV. CONCLUSION

In sum, we conclude that summary judgment was proper on each of Miller's tort claims. Summary judgment was also proper on Miller's civil conspiracy claim and Cynthia's loss of consortium claim.[6] Accordingly, we affirm the trial court's award of summary

---

[6] Because we conclude that summary judgment was proper on each of the tort and derivative claims raised by the Millers, we need not consider whether the claims were barred by Indiana's Anti-SLAPP statute.

judgment in favor of CICF and Payne.

The judgment of the trial court is affirmed.

RILEY, J., and ROBB, J., concur.