John HAEGERT, Appellant–Plaintiff,

v.

Margaret McMULLAN, Appellee–Defendant.

No. 82A04–1008–CT–470.

Court of Appeals of Indiana.

Sept. 19, 2011.

Darlene Robinson, Oakland City, IN, Attorney for Appellant.

Kenneth J. Yerkes, Hannesson I. Murphy, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

John Haegert ("Haegert") appeals from the trial court's order granting summary judgment in favor of Margaret McMullan ("McMullan") in an action filed by Haegert against her alleging defamation, tortious breach of Haegert's employment contract, and intentional infliction of emotional distress. Haegert raises the following restated issue for our review: whether the trial court erred by granting summary judgment in favor of McMullan.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Haegert joined the University of Evansville's ("the University") faculty in 1979, received tenure there in 1982, and, in 1992, became a full professor of English specializing in, among other things, American Literature and Twentieth–Century British Literature. McMullan joined the University's faculty in 1990, and was a member of the University's English Department specializing in creative writing. In the summer of 2000, the University promoted McMullan, then an assistant professor, to acting chair of the English Department. She was promoted to permanent department chair in 2002, and as such was responsible for Haegert's teaching performance evaluation. She also was responsible for coordinating student recruiting and overseeing the pairing of English majors

with faculty advisors specializing in the student's primary area of interest. McMullan asked Mike Carson ("Carson"), the previous department chair, and two other professors to advise students whose focus was on literature. Haegert had asked McMullan if he could advise literature students, but on the advice of and information received from Carson and Stuart Dorsey ("Dorsey"), the University's Vice President of Academic Affairs, that Haegert was a poor advisor, McMullan declined to allow him to advise students.

In 2002, McMullan received informal complaints from female students about some of the language Haegert used and inappropriate touching. When McMullan became the department chair Carson gave her his files containing notes about and evaluations of professors in the department. McMullan maintained those files and also made notes of unusual or significant incidents that were reported to her that might be relevant to faculty members' evaluations. Notes about those informal complaints were maintained in McMullan's "anecdotal file" on Haegert. During approximately the same time period, the University's Affirmative Action Officer, Jennifer Graban ("Graban"), received informal complaints from students about Haegert's use of terms of endearment and hugging of female students. As no formal complaints had been lodged against Haegert, Graban could not commence an investigation into the complaints. Graban, however, believed that Haegert should be notified about the informal complaints so that he could adjust his behavior. Both McMullan and Graban had conversations with Haegert about the informal complaints. McMullan and Graban both believed that Haegert was agitated by this information.

The University's tenure contracts incorporate the University's Faculty and Administrator Manual ("the Manual") by reference, and the Manual is amended from time-to-time. In March 2004, the University and Haegert entered into an employment contract for the 2004–2005 academic year, and Haegert agreed to abide by the rules and obligations imposed by the University, which included the University's no-tolerance harassment and sexual harassment policies. Haegert was aware that violation of this tenure contract would be cause for the University to terminate his employment. Neither the faculty tenure contract nor the Manual contained a provision giving faculty members the right to advise or recruit students. Faculty members whose employment had been terminated were not given the right, by contract or the Manual, to enter the University's campus or to attend campus events.

On August 25, 2004, the first day of the 2004–2005 academic year at the University, McMullan was seated in the English Department lounge interviewing a prospective student, Cassandra Stichter, and her parents. McMullan asserts that Haegert walked over to where McMullan was seated and stood directly in front of her with his belt at her eye level about a foot from her face, said "Hi, Sweetie" and then "touched and moved his fingers on [McMullan's] neck and chin in a tickling gesture for a long moment *while* [she] was addressing the prospective family." *Appellant's App.* at 593. McMullan claims that she was stunned and offended by Haegert's behavior, as were the Stichter family and the female student who was meeting with Haegert. Because she was in the midst of an interview, McMullan did not immediately comment on Haegert's behavior. The Stichters cut the interview short even though there were still twenty to thirty minutes of the interview remaining. Cassandra Stichter did not enroll at the University.

Haegert's version of the events that transpired is quite different. Haegert asserts that on that day he was in an extremely joyful mood because he had just learned that his wife was free of cancer. He states that when he walked into the English Department lounge with a student, he was warmly greeted by McMullan. He then walked over to McMullan saying "Hi, Sweetie. How is my favorite chair?" and gave her a chuck under the chin. *Id.* at 235. Haegert and the student who had accompanied him then entered his office, where he noisily dropped his briefcase.

McMullan spoke with Dorsey later that day to express that she was offended by Haegert's conduct and indicated that she wanted to file a formal complaint against Haegert. Dorsey instructed McMullan to send an e-mail to him detailing her complaint. McMullan sent an e-mail to Dorsey as instructed and forwarded the same e-mail to Graban.

On August 26, 2004, McMullan met with Graban and filed a formal complaint of harassment against Haegert with the University. Revisions were made to the text of the email, which was copied into the complaint form, and McMullan signed the formal complaint against Haegert. Graban immediately began an investigation into McMullan's complaint. Graban contacted the Stichter family to obtain their account of the incident in question. Ken Stichter, the prospective student's father, described Haegert's behavior during the telephone conversation, and later confirmed his description of the account, which had been reduced to writing by Graban, in a letter.

Per the University's policy, Graban convened a Review Committee, comprised of herself, the current ombudsperson, and a faculty member. The Review Committee interviewed both Haegert and McMullan.

Prior to McMullan's interview she refreshed her recollection of the past incidents involving Haegert by looking at her "anecdotal file" on him, and gave the file to Graban. McMullan described the August 25, 2004 incident in detail and answered the Review Committee's questions about prior incidents where Haegert's behavior had been questioned.

During Haegert's interview, he admitted to calling McMullan "Sweetie" and rubbing her under her chin. He minimized the importance and significance of the incident. When asked by the Review Committee about the prior informal student complaints, Haegert denied any wrongdoing with either students or McMullan.

The Review Committee unanimously concluded that Haegert's behavior with respect to the August 25, 2004 incident violated the University's no-tolerance sexual harassment policy, also concluding that there was sufficient evidence to support the alleged violation. The Review Committee then forwarded its report of the investigation to University President Stephen Jennings ("Jennings").

Jennings met with Haegert in an effort to resolve the matter informally, but Haegert rejected the efforts made to reach an informal resolution. Jennings then brought the formal complaint before the University's Faculty Professional Affairs Committee ("FPAC"), which was comprised of approximately twelve elected faculty representatives. Haegert submitted an e-mail to FPAC. The FPAC unanimously concluded, however, that the facts surrounding McMullan's complaint constituted adequate cause to terminate Haegert's employment with the University.

After receiving the FPAC's findings, Jennings decided to terminate Haegert's employment because of the August 25, 2004 incident involving McMullan. Hae-

gert appealed the finding of sexual harassment and his termination with the Faculty Appeals Committee ("FAC"). The FAC held an evidentiary hearing of Haegert's appeal at which both Haegert and the University were represented by counsel. Each party had the ability to call and examine witnesses and present evidence.

The University was represented by Tom Magan ("Magan"), who met with McMullan prior to the evidentiary hearing. Magan requested that McMullan supply to him her "anecdotal file" on Haegert, and McMullan complied with his request. McMullan was called as a witness at the FAC evidentiary hearing by both the University and Haegert. Magan did not introduce McMullan's "anecdotal file" as evidence during the hearing.

At the conclusion of the evidentiary hearing, the FAC unanimously concurred with the decision to terminate Haegert's employment with the University. Jennings then notified Haegert that his termination had been upheld, and that he was banned from the University's campus and events. Haegert appealed the FAC's decision to the University's Board of Trustees and had his counsel prepare a brief for the Board of Trustees on his behalf. The Board of Trustees unanimously concurred with the decision to terminate Haegert's employment concluding that he had violated the University's harassment policy.

On May 5, 2005, Haegert filed a complaint against McMullan alleging defamation, tortious breach of Haegert's employment contract, and intentional infliction of emotional distress. McMullan moved for summary judgment on all counts, and the trial court allowed the parties to brief the issues and held oral argument. McMullan's motion for summary judgment was granted as to all counts. Haegert now appeals.

## DISCUSSION AND DECISION

Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *I/N Tek v. Hitachi Ltd.*, 734 N.E.2d 584, 586 (Ind. Ct.App.2000). If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Gilman v. Hohman*, 725 N.E.2d 425, 428 (Ind.Ct.App.2000). Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *City of Indianapolis v. Byrns*, 745 N.E.2d 312, 316 (Ind.Ct.App.2001). On appeal, we are bound by the same standard as the trial court, and we consider only those matters that were designated at the summary judgment stage. *Interstate Cold Storage v. Gen. Motors Corp.*, 720 N.E.2d 727, 730 (Ind.Ct.App.1999). We do not reweigh the evidence, but we liberally construe all designated evidentia-

ry material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Estate of Hofgesang v. Hansford,* 714 N.E.2d 1213, 1216 (Ind.Ct.App.1999). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Bernstein v. Glavin,* 725 N.E.2d 455, 458 (Ind.Ct.App. 2000).

We first consider the trial court's grant of summary judgment in favor of McMullan regarding Haegert's defamation claim. Defamation is that which tends to "injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *McQueen v. Fayette Cnty. Sch. Corp.,* 711 N.E.2d 62, 65 (Ind.Ct.App.1999). To recover in an action for defamation, "that which caused the alleged defamation must be both false and defamatory." *Id.* Moreover, a plaintiff must establish the basic elements of defamation: (1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages. *Id.* The determination of whether a communication is defamatory is a question of law for the court. *Id.*

Furthermore, a plaintiff who sues for defamation must set out the alleged defamatory statement in the complaint. *Trail v. Boys & Girls Clubs of Nw. Ind.,* 845 N.E.2d 130, 136–37 (Ind.2006). Haegert states in his complaint that "McMullan impugned the character of [Haegert] when she made false statements to no fewer than 30 people regarding [Haegert]." *Appellant's App.* at 20. No specific statements were identified. Our Supreme Court has stated as follows:

> But even under notice pleading, a plaintiff must still set out the operative facts of the claim. Indeed hornbook law stresses the necessity of including the alleged defamatory statement in the complaint. There is sound reason for this policy, as the absence of a statement in the complaint works a detriment on both the court and the defendant. The court is handicapped without the statement since, without it, the court cannot actually determine if the statement is legally defamatory. The defendant is placed on an unfair footing since the absence of the statement denies her the opportunity to prepare appropriate defenses.

*Id.* at 136–37 (internal citations omitted).

Haegert argues in his brief that

> [McMullan] claimed not to know what statements [Haegert] alleged are defamatory. That claim is spurious and deceitful. [McMullan] does not have to "guess" what statements she placed in her file which defamed [Haegert]: She knows.

*Appellant's Br.* at 24. Again, the specific statements that are alleged to be defamatory have not been sufficiently identified by Haegert in his complaint. On this basis, we conclude that the trial court correctly granted McMullan's motion for summary judgment as to the count alleging defamation.

We note, however, that Haegert appears to be arguing that statements contained in McMullan's "anecdotal file" were defamatory and were shared with employees of the University, ultimately leading to Haegert's dismissal. Again, no specific statements were alleged to be defamatory, but rather the entire anecdotal file appears to have been alleged to contain defamatory statements. When McMullan became the department chair her predecessor gave her his files containing notes about and evaluations of professors in the department. McMullan maintained those files and also made notes of unusual or signifi-

cant incidents that were reported to her that might be relevant to faculty members' evaluations.

■■■ "[C]omplaints made by a current student pursuant to a university anti-harassment policy are protected by an absolute privilege and cannot serve as the basis for civil liability to a person who is the subject of the complaint." *Hartman v. Keri*, 883 N.E.2d 774, 775 (Ind.2008). We believe that it would not be a difficult stretch to find in the present case that a complaint made by a faculty member against another faculty member pursuant to a university's no-tolerance harassment policy is protected by an absolute privilege and cannot serve as the basis for civil liability to a person who is the subject of the complaint. Indeed, other jurisdictions find parent complaints of sexual harassment by teachers are protected from civil liability by an absolute privilege. *See Reichardt v. Flynn*, 374 Md. 361, 823 A.2d 566 (2003) (parents' complaints of sexual harassment by high school coach to principal and public school officials); *Brody v. Montalbano*, 87 Cal.App.3d 725, 151 Cal. Rptr. 206 (Cal.Ct.App.1978) (parents' complaints against junior high school teacher to board of education); *Weisman v. Mogol*, 118 Misc.2d 911, 462 N.Y.S.2d 383 (N.Y.Sup.Ct.1983) (parents' complaints against high school teacher to board of education). However, without reaching that conclusion, we find that McMullan nonetheless is protected from civil liability by a qualified privilege.

Our supreme court has stated the following about the publication component of defamation claims:

> In an action for defamation, the plaintiff must show that the defamatory matter was "published," that is, communicated to a third person or persons. There is substantial conflict among other jurisdictions over whether or not intracompany documents can satisfy the publication element of a defamation claim. . . .

In selecting the better view for Indiana, we find guidance in the values embodied in our state constitution. Our state expressly recognizes the particular value of an individual's interest in reputation and accords it specific protection. In Article I, section 12, the Indiana Constitution declares, in part:

> All courts shall be open; and every person, for injury done to him in his person, property, *or reputation,* shall have remedy by due course of law (emphasis added).

Analogously, our state constitutional free speech provision expressly emphasizes the need for accountability.

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: *but for the abuse of that right, every person shall be responsible.*

Ind. Const. art. I, § 9 (emphasis added). . . .

Upon employment, an individual does not relinquish the value of a good reputation. To the contrary, a person's suitability for continued employment and advancement at work may be substantially influenced by the reputation one earns. When intracompany communications injure an employee's occupational reputation, the result may be among the most injurious of defamations. We cannot deprive access to the courts for an employee who suffers very real and significant injuries as a result of intracompany defamatory falsehoods which would otherwise be actionable. Refusing to characterize such communication as a publication for a defamation action is an unacceptable legal fiction that interferes with an Indiana employee's constitution-

al right to a remedy for injury to reputation. We hold that employee evaluation information communicated intracompany to management personnel may be considered published for purposes of a defamation action.

\* \* \*

To accommodate the important role of free and open intracompany communications and legitimate human resource management needs, the qualified privilege is available to protect personnel evaluation information communicated in good faith. Qualified privilege is a defense to a defamation action and applies to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law. Intracompany communications regarding the fitness of an employee are protected by the qualified privilege.

A statement otherwise protected by the doctrine of qualified privilege may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth.

Once the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused.

*Bals v. Verduzco*, 600 N.E.2d 1353, 1354–56 (Ind.1992) (some internal citations and quotations omitted).

Neither party contends that the anecdotal file was not published. Haegert argues that McMullan has failed to establish how the statements in her anecdotal file are entitled to a qualified privilege. To support that argument, Haegert cites to *Bals* for the proposition that only personnel evaluation information communicated in good faith is entitled to the qualified privilege. *Id.* at 1356. We do not believe that *Bals* should be read that narrowly. *Bals* also cited to *Chambers v. American Trans Air, Inc.*, 577 N.E.2d 612 (Ind.Ct.App. 1991) for the proposition that a qualified privilege is a defense to a defamation action and applies to "communications made in good faith *on any subject matter* in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Id.* at 615 (quoting *Elliott v. Roach*, 409 N.E.2d 661, 672 (Ind.Ct.App.1980)) (emphasis added).

 There is no dispute that Haegert was an employee of the University and that McMullan, as the English Department Chair, was Haegert's supervisor. Likewise, it is undisputed that McMullan was responsible for evaluating Haegert's work performance. McMullan believed that as department chair she was required to maintain files on the faculty she supervised and made notes of any unusual or significant incidents reported to her that might be relevant to a faculty member's performance evaluation. The incidents noted in McMullan's anecdotal file on Haegert, were mostly informal student complaints, which were not used in Haegert's performance evaluations, per the University's policy. However, when the August 25, 2004 incident occurred, and McMullan pursued her formal harassment complaint, per University policy with Graban, she provided

her anecdotal file to her. Thus, we conclude that McMullan's communication about the anecdotal file to Graban was entitled to a qualified privilege. Furthermore, to the extent any portion of the information in the anecdotal file was testified to during the proceedings regarding the harassment complaint, that testimony is also entitled to a qualified privilege. Last, because McMullan provided the file to the University's attorney at his request as part of the investigation of her formal harassment complaint, that too was entitled to a qualified privilege.

This evidence also shows that McMullan did not abuse that qualified privilege. Haegert speculates that McMullan was motivated by ill will to compile falsehoods against him. However, the evidence shows that McMullan believed she was required to maintain files on English Department faculty members and make notes of any unusual or significant incidents reported to her that might be relevant to a faculty member's performance evaluation. McMullan maintained files on all faculty members under her supervision, not just Haegert. Furthermore, McMullan testified that she believed in the veracity of the notes contained in Haegert's file. In addition, Haegert has failed to establish how he was injured by the contents of McMullan's file, as Haegert's termination was based solely upon the August 25, 2004 incident involving McMullan. We conclude that the trial court correctly granted summary judgment as to Haegert's defamation claim.

The trial court also granted summary judgment in favor of McMullan as to Haegert's claim of tortious breach of Haegert's employment contract. Haegert argues that McMullan tortiously interfered with his contract by initiating and participating in the University's harassment investigation leading to Haegert's suspension, termination, and ban from campus, and by denying him the opportunity to recruit and advise literature students.

"Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes an intentional, *unjustified interference by third parties* with an employment contract." *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1234 (Ind.1994) (citing *Bochnowski v. Peoples Fed. Sav. & Loan,* 571 N.E.2d 282, 284 (Ind.1991)) (emphasis supplied). This cause of action recognizes the public policy that contract rights are property, which are entitled to enforcement and protection from, under proper circumstances, those who tortiously interfere with rights. *Id.* In order to recover for tortious interference with a contractual relationship, a plaintiff must establish: (1) that a valid and enforceable contract exists; (2) the defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Id.* at 1235.

To reiterate briefly here, in summary judgment proceedings, a moving party bears the burden of proving the non-existence of a genuine issue of material fact. *Winkler,* 638 N.E.2d at 1235. This burden may be met if the movant demonstrates that the undisputed material facts negate at least one element of the plaintiff's claim. *Id.* If the movant meets this burden, the non-movant may not rest upon his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Id.*

Prior to addressing Haegert's argument on this issue, we address McMullan's first assertion that she was entitled to summary judgment as to this claim because she was not a third party, and thus could not be

liable under this theory. McMullan contends that her actions occurred as agent of the University in her position as the English Department Chair and as Haegert's supervisor. She claims that she was acting within the scope of her duties for the University by overseeing recruitment, pairing students with professor supervisors, and doing her part to prevent harassment at the University. She argues that she was acting within the scope of those duties when Haegert harassed her and she participated in the investigation of the formal harassment complaint.

■ In *Levee v. Beeching*, 729 N.E.2d 215 (Ind.Ct.App.2000), we cited to the Restatement (Second) of Torts sections 766 and 766A to aid our discussion and decision of a tortious interference with an employment contract. In *Levee* we stated as follows:

> Comment. b to § 766 provides that "there is a general duty not to interfere intentionally with another's reasonable business *expectancies* of trade with third persons." (Emphasis added). Comment. a to § 766A indicates that liability will attach where one intentionally interferes with a plaintiff's performance of his own contract, "either by preventing that performance or making it more expensive *or burdensome*." (Emphasis added). Thus, where a third party's conduct substantially and materially impairs the execution of an employment contract, frustrating an employee's expectations under her contract and making performance of her contractual duties more burdensome, the inducement of breach element of a claim for tortious interference with a contractual relationship is satisfied.

729 N.E.2d at 222. In claims involving officers or directors of a corporation alleging tortious interference with the corporation's contracts, liability will not be found where the directors and officers are acting as agents of the corporation when acting in the scope of their official capacity. *Trail*, 845 N.E.2d at 138–39. It would not be a stretch in the case at bar to agree with McMullan that she cannot be liable for the actions alleged to have constituted tortious interference with Haegert's contract, because they were done in the scope of her employment with the University and as its agent. Because she is not a third party, she could not be liable under this theory.

Nonetheless, the trial court correctly determined that summary judgment in favor of McMullan was appropriate as McMullan's actions were justified. Assuming without deciding that McMullan is a third party, we turn now to address whether she acted with justification.

In determining whether a defendant's conduct is justified, the Restatement recommends the consideration of the following factors: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties." *Winkler*, 638 N.E.2d at 1235 (citing Restatement (Second) of Torts § 767 (1977)).

■ Although the weight to be given each consideration may differ from case to case, the central question to be answered is whether the defendant's conduct has been fair and reasonable under the circumstances. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 252 (Ind.Ct.App.2001). The absence of justification is established by showing "that the interferer acted intentionally,

without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Bilimoria Computer Sys., LLC v. America Online, Inc.*, 829 N.E.2d 150, 156–57 (Ind.Ct.App.2005). "The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Id.* at 157.

 From the materials designated to the trial court, the inference to be drawn from the facts and circumstances is that McMullan's actions that were at issue were justified. McMullan maintained a personal file on every English Department faculty member to assist her in evaluating their performance. Informal student complaints that were contained in the file were not used in Haegert's evaluation per University policy. McMullan turned over the anecdotal file to Graban and Magan in connection with the investigation of her harassment complaint against Haegert. McMullan consistently stated that she wanted to stop Haegert's pattern of harassing students and faculty of the University. We find that the trial court correctly granted summary judgment in favor of McMullan as to this claim.

 Haegert also alleged that McMullan had engaged in intentional infliction of emotional distress. Again, the trial court granted summary judgment in McMullan's favor. The Supreme Court first recognized intentional infliction of emotional distress as a separate cause of action in *Cullison v. Medley*, 570 N.E.2d 27 (Ind.1991). In order to establish a claim of intentional infliction of emotional distress, a plaintiff must prove that the defendant: "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind.Ct.App.2011). It is the intent to harm the plaintiff emotionally that

constitutes the basis of the tort, and the requirement to prove the elements of the tort are rigorous. *Id.*

 As noted in *Curry*, we have quoted with approval the following comment from the Restatement.

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or by a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the act, and lead him to exclaim, "Outrageous!"

*Bradley v. Hall*, 720 N.E.2d 747, 752–53 (Ind.Ct.App.1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Intentional infliction of emotional distress is established in cases "where [the] conduct exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind." *Curry*, 943 N.E.2d at 361. "In the appropriate case, the question can be decided as a matter of law." *Id.* The present case is such a case.

 There is no properly designated evidence in the record to establish that McMullan intended to cause Haegert emotional distress. McMullan acted according to the scope of her responsibilities at the

University, and filed a harassment complaint when she believed the University's zero-tolerance policy had been violated. The trial court did not err by granting summary judgment in favor of McMullan on Haegert's claim of intentional infliction of emotional distress.

Affirmed.

VAIDIK, J., and MATHIAS, J., concur.