FILED

Mar 24 2016, 9:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Swaray Edward Conteh
The Law Office of Swaray Conteh
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
ALLIANCE HOME HEALTH
CARE, LLC

John D. Papageorge
Jeffrey D. Stemerick
Taft Stettinius & Hollister, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
L.J.L. ENTERPRISES, INC., AND
LARRY J. LOGSDON

John W. Mervilde
Rick D. Meils
William M. Berish
Meils Thompson Dietz & Berish
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Roukaya Ali,<br><br>*Appellant-Plaintiff,*<br><br>v.<br><br>Alliance Home Health Care,<br>LLC, L.J.L. Enterprises, Inc.,<br>and Larry J. Logsdon,<br><br>*Appellees-Defendants* | March 24, 2016<br><br>Court of Appeals Case No.<br>49A02-1507-CT-986<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Cynthia J. Ayers,<br>Judge<br><br>Trial Court Cause No.<br>49D04-1301-CT-1068 |

**Crone, Judge.**

# Case Summary

[1] Roukaya Ali appeals a summary judgment in favor of Alliance Home Health Care, LLC ("Alliance"), L.J.L. Enterprises, Inc. ("LJL"), and LJL's sole owner Larry J. Logsdon (collectively "Appellees") on her claims of defamation, malicious prosecution, false imprisonment, intentional infliction of emotional distress, and vicarious liability, all stemming from Appellees' claims that she stole jewelry from two of her home healthcare patients.[1] We affirm.

# Facts and Procedural History

[2] The undisputed facts are as follows. Alliance is a home healthcare company in the business of providing skilled home nursing, therapy, and companion services for senior adults who often cannot care for themselves. Ali, a certified nurse's aide ("CNA") and certified home health aide ("CHHA"), began her employment as an in-home health worker at Alliance in 2007.

[3] On January 31, 2011, Alliance patient Albert Barnes and his wife discovered that twelve pieces of jewelry were missing from their home. Among the

---

[1] In her complaint, Ali also alleged negligent supervision and negligent infliction of emotional distress. She withdrew her negligent supervision claim, and the trial court entered summary judgment in favor of Appellees on that claim. With respect to her claim of negligent infliction of emotional distress, she acknowledges Indiana's rule requiring that the plaintiff in such cases sustain a "direct physical impact." *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 546-47 (Ind. Ct. App. 2015), *trans. denied* (2016). Admitting that she has not suffered any physical impact, she now withdraws this claim for appellate review. Appellant's Br. at 38. Thus, we affirm summary judgment on those claims.

missing items was Barnes's unique ring with Greek letters, small diamonds, and an anchor pin attached to it. The Barneses notified the Indianapolis Metropolitan Police Department ("IMPD"), which began an investigation. Barnes's wife told IMPD that she remembered seeing the jewelry on January 28, and Barnes said that he wore some of the rings on January 29. The couple also reported the theft to their insurance company, which in turn notified Alliance. Alliance's human resources department began an internal investigation and subsequently hired an outside company, LJL, to conduct the investigation. LJL's sole owner and president is Logsdon, a retired sheriff's department investigator. Logsdon checked the employee schedule and found that only two Alliance employees had worked at the Barnes residence between January 28 and January 31, 2011. One of those was Ali, who did not regularly work for Barnes but had worked at his home as a fill-in on January 30 and 31 from 11:00 a.m. to 5:00 p.m.

[4]     On February 7, 2011, Betty McIntyre, the regular fulltime nurse for another Alliance patient, Jack Morris, discovered that Morris was not wearing his Masonic ring. Morris was elderly and needed 24/7 care, and McIntyre knew that he never took off his Masonic ring. She noticed that he was wearing a different ring, one with Greek letters, diamonds, and an anchor pin attached. Morris's son reported the theft of the Masonic ring to IMPD. When Alliance received word of the Morris theft, Logsdon went to interview McIntyre, who told him that she last remembered seeing the Masonic ring on Morris's finger on February 4, 2011, and that she had heard Morris say, on February 7, 2011,

that his ring was missing and had been replaced with a different one. Logsdon also interviewed Theresa Azikiwe, the Alliance employee who worked for Morris on February 9, 2011. Azikiwe reported that Morris had pointed to the ring with the Greek letters, diamonds, and anchor pin and said that he wanted his son to have it.

[5] The Barneses subsequently identified the unique anchor ring found on Morris's finger as one of the items stolen from their residence. Logsdon consulted the Alliance schedules and discovered that Ali had worked as fill-in at Morris's residence on February 6, 2011. Six other Alliance employees had worked for Morris, but a comparison of the schedules showed that Ali was the only employee who had worked for both Barnes and Morris during the timeframes that they had pinpointed for the thefts. Barnes and Morris lived about fourteen miles apart and were not acquainted.

[6] Alliance terminated Ali's employment on February 27, 2011. When Ali applied for unemployment benefits, the Department of Workforce Development ("DWD") sent Alliance a form inquiring as to the reason for her termination. Alliance responded that the reason was theft. Alliance also contacted the Indiana State Department of Health ("ISDH") concerning the results of its theft investigation against Ali. ISDH conducted an evidentiary hearing and determined that Ali had misappropriated the jewelry from Barnes and Morris. As a result, ISDH revoked Ali's healthcare certifications.

[7] IMPD conducted an investigation of both thefts and interviewed numerous witnesses and suspects, including Ali. Alliance and Logsdon cooperated by providing IMPD with the information gathered during Logsdon's investigation. IMPD Detective Michael Schollmeier executed a probable cause affidavit implicating Ali as the perpetrator of both thefts.

[8] Marion County Deputy Prosecutor Robert Reel reviewed the evidence submitted by IMPD and concluded that probable cause existed to charge Ali with both thefts. A Marion Superior Court judge made a determination of probable cause and issued a warrant for Ali's arrest. The State charged her with two counts of class D felony theft. She is an African immigrant subject to deportation for a felony conviction. She was acquitted following a bench trial.

[9] Ali filed a civil action against Appellees, alleging defamation, malicious prosecution, false imprisonment, negligent supervision (subsequently withdrawn), vicarious liability, intentional infliction of emotional distress, and negligent infliction of emotional distress. Appellees sought summary judgment, which the trial court granted. The trial court subsequently issued an order clarifying that its summary judgment order pertained to LJL and Logsdon as well as to Alliance. Ali now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

[10] Ali maintains that the trial court erred in granting summary judgment in favor of Appellees. We review a summary judgment de novo, applying the same

standard as the trial court and drawing all reasonable inferences in favor of the nonmoving party. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). In conducting our review, we consider only those matters that were designated at the summary judgment stage. *Haegert v. McMullan*, 953 N.E.2d 1223, 1229 (Ind. Ct. App. 2011). Summary judgment is appropriate if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Hughley*, 15 N.E.3d at 1003; Ind. Trial Rule 56(C).

[11]   The moving party bears the initial burden of demonstrating the "absence of any genuine issue of fact as to a determinative issue." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). Then the burden shifts to the nonmoving party to "come forward with contrary evidence" showing a genuine issue for the trier of fact. *Id*. at 762. The nonmoving party cannot rest upon the allegations or denials in the pleadings. *Syfu v. Quinn*, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005). In *Hughley*, our supreme court emphasized that the moving party bears an onerous burden of affirmatively negating the opponent's claim. 15 N.E.3d at 1003. This approach is based on the policy of preserving a party's day in court, thus erring on the side of allowing marginal cases to proceed to trial on the merits rather than risking the short-circuiting of meritorious claims. *Id*. at 1003-04. A trial court's grant of summary judgment arrives on appeal clothed with a presumption of validity. *Williams*, 914 N.E.2d at 762.

[12]   We note that the trial court issued findings of fact and conclusions thereon as part of its summary judgment order. Special findings are neither required nor

binding on appeal of a summary judgment. *New Albany Preservation Comm'n v. Bradford Realty, Inc.*, 965 N.E.2d 79, 84 (Ind. Ct. App. 2012). However, the findings offer valuable insight into the trial court's rationale and are helpful in facilitating our review. *Id*.

## Section 1 – The trial court did not err in granting summary judgment on Ali's defamation claims.

[13] Ali submits that the trial court erred in granting summary judgment in favor of the Appellees on her defamation claims.

> Defamation is that which tends to "injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." To recover in an action for defamation, "that which caused the alleged defamation must be both false and defamatory." Moreover, a plaintiff must establish the basic elements of defamation: (1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages. The determination of whether a communication is defamatory is a question of law for the court.

*Haegert*, 953 N.E.2d at 1230 (citations omitted).

[14] "[A] plaintiff who sues for defamation must set out the alleged defamatory statement[s] in the complaint." *Id*. "When specific statements that are alleged to be defamatory have not been sufficiently identified in a plaintiff's complaint, an award of summary judgment for the defendant is proper." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 956 (Ind. Ct. App. 2014), *trans. denied* (2015).

[15]     In Counts II and III of her complaint,[2] Ali averred:

> From February 1, 2011, through July 17, 2012, and on numerous other occasions, in conversations which Logsdon, Roselyn Howard, Deborah Rood, Alicia Epler, Janice Roberts and other agents of Alliance had with and in the hearing and presence and presence [sic] of certain persons, maliciously made certain slanderous, false, malicious, and defamatory statements about Plaintiff stating that Plaintiff stole from Client One and Client Two pieces of jewelry on several occasions.

Appellant's App. at 32-33. This allegation does not specifically identify the statements alleged to have been made by each of the several named individuals "or other agents." *Id.* Nor does it specify the persons to whom (or in front of whom) the alleged defamatory statements were published. We find that it lacks the specificity necessary to state a claim for defamation. Ali's subsequent attempts in both her brief in opposition to summary judgment and her appellant's brief to add specific examples of allegedly defamatory statements are not sufficient to salvage her claims. Notwithstanding, we address her supplemental allegations of defamatory statements as best we can discern them.

---

[2]  Count II was titled "Slander Per Quod," and Count III was titled "Slander Per Se." Appellant's App. at 32-33. We address these together, as our analysis does not require us to discuss the elements that differentiate the two torts. *See, e.g.*, *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007) (stating that communication is defamatory per se if it imputes criminal conduct, loathsome disease, misconduct in person's trade, profession, office, or occupation, or sexual misconduct and emphasizing that damages are presumed in defamation per se cases).

[16] Appellees assert that the communications cited by Ali in her brief and in her motion in opposition to summary judgment are protected by qualified privilege or by statute.

> [Qualified] privilege is a defense against a defamation action and protects "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty ... if made to a person having a corresponding interest or duty." The privilege may be overcome when the plaintiff demonstrates an abuse of the privilege.

[17] *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006) (citations omitted). A communication may lose its privileged character upon a showing of abuse where "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." *Williams*, 914 N.E.2d at 763-64 (quoting *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992)).

## Section 1.1 – Appellees' communications with law enforcement are qualifiedly privileged.

[18] Appellees claim that their statements to law enforcement concerning Ali's connection to the thefts are subject to the qualified privilege exception. It is well established that "communications made to law enforcement to report criminal activity are qualifiedly privileged." *Williams*, 914 N.E.2d at 763 (quoting *Kelley v. Tanoos*, 865 N.E.2d 593, 600 (Ind. 2007)). This furthers the compelling public interest of encouraging citizens not only to report suspected

wrongdoing but also to assist law enforcement in investigating and apprehending persons who engage in criminal activity. *Id*. at 762-63.

> If this purpose is to be met, the privilege must offer a robust defense against liability. Protecting unverified and even speculative reports of suspected wrongdoing to law enforcement is, in our view, supported by ample reasons of social advantage. It is important that citizens not opt for inaction, chilled from communicating with police in all but the most certain of situations.

*Id*. at 765.

[19] Significantly, it was Barnes's and Morris's relatives, not Appellees, who initiated the contact with IMPD by reporting the thefts. Appellees simply cooperated with IMPD by sharing the results of their internal investigation. Ali now claims Appellees acted with ill will based on her race and immigrant status. She relies on our recent decision in *Bah v. Mac's Convenience Stores, LLC*, claiming that this renders summary judgment inappropriate because her claim hinges on state-of-mind and witness credibility. 37 N.E.3d 539, 548-49 (Ind. Ct. App. 2015), *trans. denied* (2016).

[20] We find *Bah* distinguishable. There, the plaintiff/employee had a contentious relationship with her supervisor that included his giving her a negative evaluation, his transferring her to a smaller store over her objection, her attempts to go over his head to report malfeasance, and her refusal to resign. *Id*. In contrast, here, Ali designated no evidence of any history of a negative relationship with Alliance personnel. Logsdon did not know her or even know

of her until he began his investigation, and his conclusions were based largely on information contained in the employee schedules showing that she was the link between the two unacquainted victims. None of this implicates her race or immigrant status, and she neither raised such an allegation in her complaint nor designated evidence to that effect. Nor has she designated evidence substantiating her claim that Logsdon essentially commanded IMPD to arrest her. In short, she failed to designate evidence to overcome the qualified public interest privilege concerning Appellees' communications with law enforcement.

## Section 1.2 – Alliance's communications to its insurance agent are protected by the common interest qualified privilege.

[21] Ali also claims that Alliance's correspondence with its insurance agent is defamatory. Alliance asserts that these communications are protected by the common interest privilege.

> A communication is protected by a qualified privilege of common interest if the communication was made "in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." The privilege exists because of "the necessity for full and unrestricted communication on matters in which the parties have a common interest or duty." The existence of a qualified privilege does not change the actionable nature of the words spoken. Rather the privilege "rebuts the element of malice implied by law for the making of a defamatory statement." The elements of the defense are: (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner to the appropriate parties only.

> The defendant has the burden to produce evidence establishing the existence of the privilege. Whether the privilege exists is generally a question of law.

*Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1232-33 (Ind. Ct. App. 2005) (citations omitted).

[22] Here, Alliance's human resource manager Roselyn Howard sent an email titled "Liability Claim" to the company's insurance agent. Appellant's App. at 281. The email briefly explained that a family member of Morris had inquired about whether Alliance's insurer would reimburse Morris the cost of replacing his stolen ring. In the email, Howard indicated her intent to fax the applicable police reports. She also provided contact information for Morris's son in case the insurer needed additional information. The email included a standard "CONFIDENTIALITY NOTICE" indicating that the communication was "proprietary, privileged, confidential and/or exempt from disclosure under applicable law." *Id.*

[23] We conclude that the communication between Alliance and its insurer was a good faith attempt to discern whether the insurer would cover its client's loss, an issue of common interest to both insurer and insured. The communication was limited in scope and nature and included an adequate admonition regarding its confidential nature. As such, it was protected by the qualified common interest privilege as a matter of law.

## Section 1.3 – Appellees' communications with ISDH are protected by statute.

[24]     Ali asserts that Appellees defamed her to ISDH, thereby causing her to lose her licenses to practice as a CNA and CHHA. Indiana Code Section 16-28-13-9(3) states, "A person … who in good faith … makes a report to the state department [of health] or the nurse registry[] is immune from both civil and criminal liability arising from those actions." Importantly, Alliance did not submit its report to ISDH until after IMPD and Logsdon had completed their independent investigations and concluded that Ali had committed the thefts. ISDH then conducted a hearing and made an independent determination that Ali had taken the jewelry from the victims. Logsdon's testimony was merely part of that hearing. Ali did not designate evidence indicating that Appellees had ill will or a lack of belief in the truth of the findings contained in their report to ISDH. This is exactly the type of information protected by the statute.

## Section 1.4 – Alliance's communications with DWD are protected by statute.

[25]     Similarly, Alliance's communications with DWD are privileged pursuant to statute. Indiana Code Section 22-4-17-9 states in pertinent part,

> Any testimony or evidence submitted in due course before the board, the department, the review board, an administrative law judge, or any duly authorized representative of any of them shall be deemed a communication presumptively privileged with respect to any civil action except actions to enforce the provisions of this article.

Here, Alliance did not initiate contact with DWD. Rather, DWD initiated contact with Alliance after Ali sought unemployment benefits. As required by law, Alliance filled out a form responding to DWD's inquiry concerning the reason for Ali's termination, theft. The record is devoid of any designated evidence indicating that Alliance acted with ill will or a lack of good faith in simply complying with this statutory obligation. Rather, this is precisely the type of communication that the statute is intended to protect.

## Section 1.5 – Logsdon's communications in furtherance of his investigation are not defamatory as a matter of law.

[26] The designated evidence shows that Logsdon made statements to IMPD, the victims, and certain Alliance healthcare workers as part of his investigation. As discussed, his communications to IMPD are protected by the qualified privilege. As for his communications to the theft victims concerning the results of his investigation, we conclude that they do not amount to defamation because they were not *false and* defamatory. *Haegert*, 953 N.E.2d at 1230 (stating that in a defamation action, plaintiff must establish that defendant made statements that were both "false and defamatory"). Instead, he was simply reporting that the evidence led him to conclude that Ali was the thief and that IMPD was charging her as such. This is also true of his statement to another Alliance employee previously under suspicion. Ali characterizes these statements as direct accusations that she stole the jewelry rather than merely recitations of Logsden's investigation results. Even assuming that Logsdon's statements were so direct, Ali has designated no evidence to support an

inference that his statements were knowingly false when made. Rather, she simply relies on her subsequent criminal acquittal and launches an unsubstantiated claim of bigotry against a person who had no history with her and did not even know of her prior to the investigation. Based on the foregoing, we conclude that the trial court did not err in granting summary judgment on this or any of Ali's defamation claims.

## Section 2 – The trial court did not err in granting summary judgment on Ali's malicious prosecution claim.

[27] Ali maintains that the trial court erred in granting summary judgment on her malicious prosecution claim. To establish a case for malicious prosecution, the plaintiff must prove that "(1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005), *trans. denied*. "[A] judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004). The plaintiff may overcome such a prima facie showing of probable cause only by demonstrating that it was induced by false testimony, fraud, or other improper means. *Id.*

[28] Here, the designated evidence shows the following: (1) Barnes's and Morris's relatives initiated contact with IMPD concerning the victims' missing jewelry;

(2) IMPD conducted an independent investigation concerning the thefts, only part of which involved consulting with Appellees concerning the results of their internal investigation; (3) the deputy prosecutor analyzed the evidence and, having determined in his discretion that probable cause existed to file an information charging Ali with theft, initiated criminal proceedings against her; and (4) the criminal court judge made a judicial determination of probable cause. To the extent that Ali suggests that her eventual acquittal conclusively establishes that no probable cause existed to charge her with theft in the first place, we emphasize that "the amount of evidence necessary to meet the probable cause requirement ... is less than the level of proof necessary to establish guilt beyond a reasonable doubt." *Wells v. Bernitt,* 936 N.E.2d 1242, 1253 (Ind. Ct. App. 2010), *trans. denied* (2011).

[29] In short, the prosecutor, not Appellees, initiated the action based on IMPD's investigation, and Ali failed to designate evidence to rebut the prima facie judicial determination of probable cause. Thus, her malicious prosecution claim fails as a matter of law.

## Section 3 – The trial court did not err in granting summary judgment on Ali's false imprisonment claim.

[30] Ali contends that the trial court erred in granting summary judgment on her false imprisonment claim. The tort of false imprisonment amounts to an "unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104-05 (Ind. Ct. App. 2002), *trans. denied* (2003). Below, Ali never alleged that

Appellees unlawfully detained or restrained her.[3]  Instead, she predicated her false imprisonment claim on Appellees' assistance to authorities in conducting their investigation and pursuing criminal charges, which resulted in her being jailed pending her release on bond.

[31]  Where the plaintiff claims false arrest, she must demonstrate the absence of probable cause to make the arrest.  *Id.* at 1104.  "Probable cause for arrest is demonstrated by facts and circumstances known to the arresting officer which would warrant a person of reasonable caution and prudence in believing that the accused had committed or was committing a criminal offense."  *Id.*  Where "the plaintiff in a false arrest action fails to demonstrate the absence of probable cause, or if the record as a whole reflects probable cause for the arrest, then the plaintiff's case must fail."  *Id.*

[32]  Ali alleges that she never would have been arrested in the first place had Appellees not provided false information to IMPD.  In other words, her claim flows from what she deems a false arrest and imprisonment based on false information.  Acting on evidence from IMPD, the prosecutor determined that probable cause existed to charge Ali with theft, and the criminal court made a determination to the same effect.  A judicial determination amounts to a prima

---

[3]  Ali now alleges that Logsdon falsely imprisoned her in giving her a ride to the police station for her polygraph.  However, she failed to list this allegation in her complaint.  Even so, this new false imprisonment allegation cites the length of time consumed by the polygraph itself and not the ride to and from it.  IMPD was in charge of the polygraph, and Logsdon agreed to drive Ali to the polygraph site as an accommodation because she did not want her neighbors to see her in a marked patrol car.  In short, this belated allegation is meritless.

facie showing of probable cause rebuttable only by evidence showing that the finding of probable cause was induced by fraud or false testimony. *Street v. Shoe Carnival, Inc.*, 660 N.E.2d 1054, 1057-58 (Ind. Ct. App. 1996).

[33] Nothing in the designated evidence shows malicious or fraudulent intent on the part of Appellees. The peculiar circumstances of Barnes's ring ending up on the finger of Morris, a perfect stranger living fourteen miles away, as a replacement for Morris's missing ring led Appellees to check for a link between the two patients. Documentary evidence in the form of employee schedules showed that link to be Ali, the only home healthcare worker who cared for each man immediately before his jewelry was discovered missing. Simply put, Ali failed to designate evidence indicating a malicious or fraudulent motive. Thus, the trial court did not err in granting summary judgment on Ali's false imprisonment claim.

## Section 4 – The trial court did not err in granting summary judgment on Ali's intentional infliction of emotional distress claim.

[34] The tort of intentional infliction of emotional distress ("IIED") occurs when the defendant "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Bah*, 37 N.E.3d at 549 (quoting *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011)). The requirements to prove this tort are rigorous, and at its foundation is "the intent to harm the plaintiff emotionally." *Id*. at 550. As

often quoted from Comment d of the Restatement (Second) of Torts Section 46 (1965),

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* The question of what amounts to extreme and outrageous conduct depends in part on prevailing cultural norms and values, and "[i]n the appropriate case, the question can be decided as a matter of law." *Id.*

[35] This is one of those cases. Ali designated no evidence to indicate that Alliance intended to cause her emotional harm. Instead, the designated evidence shows that she had no past incidents during her four-year employment that would have caused her superiors to single her out for detrimental treatment. *Cf. Bah*, 37 N.E.3d at 548-49 (where employee and supervisor had contentious relationship that included employee's objection to her transfer to smaller store, refusal to resign, negative evaluation, and going over supervisor's head to report

concerns). Similarly, Ali designated no evidence indicating that Logsdon, an independent contractor hired to conduct Alliance's internal theft investigation, knew or even *knew of* Ali before interviewing her. Rather, Ali was just one of several Alliance home healthcare employees interviewed as part of the investigation. Logsdon simply followed the evidence, which showed that a ring reported stolen from one patient ended up on the finger of a totally unrelated patient fourteen miles away. Based on Alliance's documentation of work schedules, he then concluded that, as Ali was the only employee who had worked for both patients during the time of the alleged thefts, she was the link between the two patients in this bizarre set of circumstances. From an objective viewpoint, this conduct was not outrageous; it was reasonable. Based on the foregoing, we conclude that the trial court properly granted summary judgment on Ali's IIED claim.

## Section 5 – The trial court did not err in granting summary judgment on Ali's vicarious liability claim.

[36] Finally, Ali asserts that the trial court erred in granting summary judgment on her vicarious liability claim. Under the doctrine of respondeat superior, vicarious liability will be imposed upon an employer whose employee commits a tort while acting within the scope of employment. *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008). By definition, respondeat superior requires that there be an underlying tort in the first place and that the underlying tort be incidental to the employee's authorized conduct or, to an appreciable extent, done to further the employer's business. *Id.*

[37] Here, Ali did not allege any tort by an individual employee of Alliance. As for whether Logsdon's conduct can be attributed to Alliance, we observe that Logsdon was not an employee of Alliance. He was sole owner and employee of LJL and was merely hired as an independent contractor to conduct an investigation of alleged thefts committed against Alliance's home healthcare patients. We have long held that, subject to specific exceptions, a principal is not liable for the torts of independent contractors. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind. 1999). The exceptions, none of which apply here, are:

> (1) where the contract requires the performance of intrinsically dangerous work; (2) where the principal is by law or contract charged with performing the specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken; and (5) where the act to be performed is illegal.

*Id*.

[38] As previously discussed, Logsdon did not commit a tort. Thus, respondeat superior does not apply against any Appellees as a matter of law. Even if Logsdon's conduct had amounted to an actionable tort, it would not be chargeable to Alliance. The trial court did not err in granting summary judgment on this issue. Accordingly, we affirm.

[39] Affirmed.

Vaidik, C.J., and Bailey, J., concur.